# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-891

STATE OF LOUISIANA

VERSUS

**CEDRIC CHARLES EDWARDS**
**AKA CEDERIC C. EDWARDS**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR125054
HONORABLE HERMAN C. CLAUSE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, James T. Genovese, and Shannon J. Gremillion, Judges.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

**Michael Harson**
**District Attorney, 15th JDC**
**Roger P. Hamilton, Jr.**
**Assistant District Attorney**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Jermaine D. Williams**
**J.D. Williams & Asssociates, APLC**
**1313 Lafayette St.**
**Lafayette, LA 70501**
**(337) 235-3989**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **Cedric Charles Edwards**

**PICKETT, Judge.**

## FACTS

During the search of an apartment where the defendant, Cedric Charles Edwards AKA Cederic C. Edwards, was staying with his girlfriend, the defendant's parole officer and police found cocaine, marijuana, methlyenedioxymethamphetamine (MDMA), alprazolam, methamphetamine, and a firearm.

The defendant was charged by bill of information filed on October 1, 2009, with the following: 1) possession with intent to distribute cocaine, a violation of La.R.S. 40:967; 2) possession with intent to distribute marijuana, a violation of La.R.S. 40:966; 3) possession with intent to distribute MDMA, a violation of La.R.S. 40:966; 4) possession of alprazolam, a violation of La.R.S. 40:969; 5) possession of methamphetamine, a violation of La.R.S. 40:967; 6) possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1; 7) possession of a firearm while in possession of a controlled dangerous substance, a violation of La.R.S. 14:95; and 8) illegal use of controlled dangerous substances in the presence of persons under seventeen years of age, a violation of La.R.S. 14:91.13. A written plea of not guilty was filed on November 10, 2009.

An amended bill of information was filed on May 26, 2010. Therein, count one was amended to a charge of possession of cocaine and count eight was deleted. A second amended bill of information was filed on June 7, 2010, in which there were no changes in the offenses charged. The defendant entered a plea of not guilty to the amended bills on December 6, 2010.

Trial by jury commenced on August 16, 2011. On August 17, 2011, the jury returned verdicts of guilty as charged on counts one, four, five, six, and seven, and

guilty of the responsive verdict of possession of marijuana on count two and possession of MDMA on count three.

The defendant filed a "Motion for Post Verdict Judgment of Acquittal, or, in the Alternative, Motion for New Trial" on August 23, 2011. The motion was denied on January 13, 2012. The defendant was then sentenced as follows: 1) possession of cocaine - five years at hard labor; 2) possession of marijuana – six months in parish jail; 3) possession of MDMA – five years at hard labor; 4) possession of alprazolam – five years at hard labor; 5) possession of methamphetamine – five years at hard labor; 6) possession of a firearm by a convicted felon – fifteen years at hard labor without benefit of probation, parole, or suspension of sentence; and 7) possession of a firearm while in possession of a controlled dangerous substance – five years at hard labor without benefit of probation, parole, or suspension of sentence. All sentences were to run concurrently but consecutively to any other sentence the defendant was serving.

A motion for appeal was filed on January 17, 2012, and was subsequently granted. The defendant is now before this court asserting three assignments of error.

## ASSIGNMENTS OF ERROR

1.  The Trial Court erred when it did not grant the Defendant's Motion to Suppress due to the fact that an illegal search occurred.

2.  The Trial Court erred when it granted the Defendant's challenge as the State of Louisiana systematically excluded potential Black jurors in direct violation of *Batson*; however granted no relief to the Defendant.

3.  There was insufficient evidence to support a finding of guilt.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent. The record does not indicate that the trial court advised the defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Therefore, we remand and instruct the trial court to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within thirty days of the rendition of this opinion and to file written proof of same in the record of these proceedings.

## ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, the defendant contends there was insufficient evidence to support a finding of guilty of the charges for which he was convicted. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, a reviewing court must first determine the sufficiency of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La.1992). Accordingly, we will address this assignment of error first.

> When a sufficiency of the evidence claim is raised on appeal, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Macon*, 06-481 (La.6/1/07), 957 So.2d 1280 (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Further, the trier of fact is responsible for determining the weight of the evidence and may accept or reject, in whole or in part, the testimony of any witness. *Id.* The appellate court should not assess credibility or re-weigh the evidence and may only intrude upon the fact-finding function of the jury to the extent necessary to satisfy the *Jackson* standard of review. *Id.*

*State v. Jasper*, 11-488, p. 4 (La.App. 3 Cir. 11/2/11), 75 So.3d 984, 987.

3

The defendant contends all narcotics and the gun found by police were found inside a residence that did not belong to him. Additionally, substantially all of the evidence was found inside a woman's purse and/or inside a woman's shoe box that contained women's shoes, which clearly did not belong to him. The defendant asserts the state failed to produce any evidence that he actually or constructively possessed any of the contraband found in the residence. Therefore, there was insufficient evidence to find him guilty of the charges at issue. Because the defendant challenges only the possessory element of the offenses, we will determine whether the state presented evidence sufficient to support only that element of the offenses.

The defendant was convicted of possession of cocaine, marijuana, MDMA, alprazolam, and methamphetamine.

> Possession of narcotic drugs can be established by actual physical possession or by constructive possession. *State v. Trahan*, 425 So.2d 1222, 1226 (La.1983). A person can be found to be in constructive possession of a controlled substance if the State can establish that he had dominion and control over the contraband, even in the absence of physical possession. *State v. Harris*, 94-0970, p. 4 (La.12/8/94), 647 So.2d 337, 338-39.
>
> A determination of whether there is sufficient "possession" of a drug to convict depends on the particular facts of each case. *Trahan*, 425 So.2d at 1226. Although mere presence in an area where drugs are located or mere association with one possessing drugs does not constitute constructive possession, this court has acknowledged several factors to be considered in determining whether a defendant exercised sufficient control and dominion to establish constructive possession, including: (1) his knowledge that drugs were in the area; (2) his relationship with the person, if any, found to be in actual possession; (3) his access to the area where the drugs were found; (4) evidence of recent drug consumption; and (5) his physical proximity to drugs. [*State v.*] *Toups*, [01-1875,] p. 4 [La. 10/15/02], 833 So.2d [910,] 913.

*State v. Major*, 03-3522, pp. 7-8 (La.12/1/04), 888 So.2d 798, 802.

4

The defendant was also convicted of possession of a firearm by a convicted felon and possession of a firearm while in possession of a controlled dangerous substance.

> Actual possession of a firearm is not necessary to satisfy the possession element of the statute; it is sufficient that the subject had constructive possession. A person is in constructive possession of a thing if it is subject to his dominion and control. A person's dominion over a weapon constitutes constructive possession even if it is only temporary in nature and even if control is shared. The jurisprudence additionally requires proof that the offender was aware that a firearm was in his presence, and that he had the general criminal intent to possess the weapon.

> *State v. Lee*, 02-704, p. 5 (La.App. 5 Cir. 12/30/02), 836 So.2d 589, 593, *writ denied*, 03-535 (La.10/17/03), 855 So.2d 755 (footnotes omitted).

> As for the element of general intent to possess the weapon, intent is a fact question which "may be inferred from the circumstances of a transaction." *State v. Johnson*, 09-862, p. 3 (La.App. 3 Cir. 2/3/10), 28 So.3d 1263, 1267.

*State v. Ceasar*, 11-1406, p. 4 (La.App. 3 Cir. 6/6/12), 91 So.3d 1231, 1234.

Probation and Parole Officer Kelly Hardy testified that she was the defendant's parole officer on July 31, 2009. This was a courtesy supervision for the state of Virginia where he had previously been convicted of first degree murder. The defendant listed his residence as 813 North Frederick Avenue, Kaplan, Louisiana. Officer Hardy attempted to conduct an in-home visit with the defendant at his residence on four separate dates, July 15, 28, 30, and 31, 2009.

In January 2009, Officer Hardy was contacted by detectives from the Lafayette Police Department who provided her information that the defendant had been seen in possession of a firearm and told her he was suspected of being involved in narcotics. They also informed her they wanted to speak to the defendant regarding an ongoing homicide investigation.

Officer Hardy testified that during July, the defendant told her that he stayed two to three nights a week at an apartment in Lafayette which Officer Hardy believed was leased by Narcisse O'Brien,[1] and this occurred on a regular basis while he was working in Lafayette. On July 31, 2009, when unable to contact him at his address in Kaplan, Officer Hardy went to an apartment on South Beadle Road in Lafayette. She knocked on the door, and a juvenile answered and told her the defendant was asleep. While the juvenile went to get the defendant, Officer Hardy called Detective Brad Robin of the Lafayette Police Department and notified him she had located the defendant. The defendant subsequently came to the door, and she spoke to him inside and outside the apartment about his supervision fees for ten minutes. Officer Hardy testified that she did not notice anything unusual or suspicious at that time. Officer Hardy then left and returned four or five minutes later.

When Officer Hardy returned to the apartment, she was accompanied by Detective Robin and Detective Benjamin Suire, also of the Lafayette Police Department. Officer Hardy testified that she went back to the apartment for the specific purpose of allowing the detectives to speak to the defendant. The detectives spoke to the defendant while they were seated at a kitchen table, and Officer Hardy "went . . . down the hallway into the apartment to just . . . see what the apartment was." Officer Hardy was asked what had changed between the two visits, and she explained that she would not search the residence of a parolee unless accompanied by another officer for safety reasons.

Officer Hardy testified she entered the master bedroom and saw a scale, which she testified was used to weigh illegal drugs, sitting on the night stand next

---

[1]This witness's first and last names were spelled differently in the transcripts of trial and the motion to suppress. We have used the spelling found in the trial transcript.

to the bed. On the second shelf of the night stand, Officer Hardy saw an empty gun holster. Officer Hardy then looked inside the closet. She testified she picked up two or three blankets and found a loaded revolver. Officer Hardy testified that there were male clothes and shoes in the closet.

Officer Hardy subsequently searched a chest of drawers and found the defendant's state issued identification card inside one of the drawers. Officer Hardy then went into the kitchen and picked up a pack of cigarettes located in front of the defendant. Inside, she found what she believed was a "marijuana blunt cigarette." Officer Hardy testified that the pack of Newport cigarettes was in the defendant's possession. She later testified the package was already on the table, and she could not recall if she saw the defendant with the cigarette pack in his hands.

Officer Hardy testified she returned to the bedroom and found that Detective Suire had taken out the bottom drawer of the chest of drawers. Under the drawer, he found a black purse and a cellophane bag that contained green vegetable matter, which Officer Hardy believed was marijuana. Officer Hardy opened the purse and found four cellophane bags that contained green vegetable matter that she believed was marijuana, a cellophane bag containing two smaller bags of white powder, and a cellophane bag that contained numerous green pills. Officer Hardy subsequently found a cellophane bag that contained orange pills in a bronze baby shoe located on the night stand. Officer Hardy further testified that Detective Suire found an open shoe box that contained a pair of women's shoes and unspent bullets.

Officer Hardy testified that the defendant had a child with O'Brien. Officer Hardy also testified that O'Brien told her the defendant "stayed" at her residence, but Officer Hardy did not recall how often he did so. O'Brien further stated the

items found by police did not belong to her. Officer Hardy testified that during a police interview, the defendant admitted the items found in the apartment were his.

Lafayette Police Department Officer William White testified that police found approximately ninety-five or 105 grams of marijuana, approximately one gram of cocaine, 172 pills consistent with MDMA, one pill containing alprazolam, and five pills containing methamphetamine in the apartment.

Officer White interviewed the defendant. During that interview, the defendant stated the gun found by police belonged to a friend of his girlfriend, and he admitted handling the gun the night before it was found by police. However, no fingerprints were found on the gun. The defendant further stated the narcotics found were his and did not belong to his girlfriend. He further testified that O'Brien told him the defendant was living at her apartment.

Detective Suire testified that he was present at the apartment on July 31, 2009. He sat down at the kitchen table with the defendant and Detective Robin, and Officer Hardy announced she was going to search the apartment. He subsequently assisted Officer Hardy in conducting a search. He corroborated Officer Hardy's testimony that bullets were found in a shoe box between the night stand and the closet and marijuana under the bottom dresser drawer. When asked about the pack of cigarettes on the kitchen table, Detective Suire could not recall if the cigarette pack was on the table when he entered the kitchen.

O'Brien testified that in July of 2009 she was romantically involved with the defendant, and he was the father of her child. O'Brien was at work on the day in question, and the defendant was at her apartment watching her two children. O'Brien indicated the defendant watched the children four to five times a week so she could work. She denied that he lived at the apartment. O'Brien testified that the defendant did not have any personal items at her apartment, and she did not

8

consider it to be his residence. O'Brien additionally testified that she smoked Newport cigarettes.

O'Brien testified she had not seen drugs in her apartment prior to being shown the drugs police had seized. Additionally, she had never seen the defendant with drugs while in her apartment. O'Brien testified that the gun found by police belonged to her neighbor, Kenneth Wilder. O'Brien further testified that Wilder had been at her apartment the night before the gun was found and had left the gun there. O'Brien testified that she told Officer Hardy the drugs did not belong to her.

The defendant testified that he occasionally spent the night at O'Brien's apartment, and he was there on July 31, 2009, to babysit while O'Brien was at work. The defendant agreed that Officer Hardy announced she was going to search the apartment and that he did not verbally object to the search. The defendant denied the gun found in the closet was his. The defendant testified the gun and some bullets were in a shoe box, and he knocked the box over when he went into the apartment. He further testified that he put the gun back in the box and told O'Brien to get rid of it.

The defendant testified that he became aware there were pills and marijuana inside the apartment when he was questioned by police. He denied stating the drugs belonged to him. The defendant testified that he had never seen the drugs prior to July 31, 2009, and never possessed them. The defendant testified that he placed his identification card on the table on the morning in question and had no idea how it got into the chest of drawers.

**Drugs**

In *State v. Brown*, 04-1194 (La.App. 5 Cir. 4/26/05), 902 So.2d 542, *writ denied*, 05-1637 (La. 2/3/06), 922 So.2d 1173, a bag of marijuana was found in a duffle bag in a cedar chest in the master bedroom of the defendant's girlfriend's

apartment. Police testified that the defendant admitted the bag was his and stressed that his girlfriend was innocent. The defendant further admitted that he knew who brought the marijuana to the apartment but refused to divulge that person's name. A defense witness testified the defendant lived in Florida, was in town visiting, and his girlfriend's brother brought a bag of marijuana to the apartment. The defendant's girlfriend also testified that the defendant lived in Florida, and another man brought a duffle bag to her apartment, but she did not know what was in the bag.

The fifth circuit noted that police testified that the defendant admitted to knowledge of the marijuana's location and of the person who delivered it to him. The defendant also told police that his girlfriend had no knowledge of the marijuana. Police additionally testified that none of the other occupants of the apartment took responsibility for the marijuana. The fifth circuit also noted it was apparent that the jury found the police officers' testimony more credible. The fifth circuit then stated:

> Regardless of whether defendant was still living at the Celestine Street address at the time of the offense, he clearly had access to the area where the marijuana was found. He had an intimate relationship with Tammy Lagarde, who lived at the house. The evidence showed he was inside the house shortly before the search warrant was executed. Detective Boylen testified that he saw defendant leave the house during his surveillance. By his own admission, defendant had a history of drug offenses, including a 1987 conviction for possession with intent to distribute marijuana.

*Id.* at 547-48. The fifth circuit then affirmed the defendant's conviction for possession of marijuana with intent to distribute.

Officers Hardy and White testified the defendant stated the drugs found in the apartment were his. This testimony was sufficient to prove the defendant had constructive possession of the drugs found. The jury clearly chose to believe this testimony over that of the defendant, and this court will not second guess that

10

credibility determination. Accordingly, the evidence is sufficient to support the defendant's convictions for possession of cocaine, marijuana, MDMA, alprazolam, and methamphetamine, when reviewed in a light most favorable to the prosecution in accordance with the *Jackson* standard.

**Firearm**

In *State v. Goldsmith*, 519 So.2d 299 (La.App. 2 Cir. 1988), the defendant stated he picked up a pistol from a ditch in a residential area were children played and put it in his back pocket in an attempt to avoid risk to children. The second circuit noted that temporary possession had been held to constitute possession proscribed by La.R.S. 14:95.1 and affirmed the defendant's conviction for possession of a firearm by a convicted felon.

In *State v. Blackson*, 45,525 (La.App. 2 Cir. 8/11/10), 46 So.3d 810, *writ denied*, 10-2133 (La. 4/1/11), 60 So.3d 1247, the second circuit found the evidence was sufficient to establish the defendant exercised dominion or control of a shotgun found behind a house near where police began to chase the defendant, and the defendant admitted that he had fired the gun earlier in the day.

In *State v. Brokenberry*, 41,481 (La.App. 2 Cir. 11/3/06), 942 So.2d 1209, police stopped a vehicle driven by the defendant and occupied by three passengers. Upon being questioned, the defendant admitted there were weapons inside the vehicle. Inside the vehicle, police found a MAC 90 rifle, with its barrel propped between the front seats and the stock on the backseat floorboard. They also found a Glock 40 handgun on the front passenger floorboard. Police testified that both weapons were within the defendant's reach. The defendant informed police that he did not own the weapons, and they had been purchased by his brother and father. The defendant admitted he knew the weapons were in the vehicle. When

confronted with the fact that he was near the weapons, the defendant stated: "Man, these streets are dangerous; you can't blame me for carrying these." *Id*. at 1211.

At trial, one of the passengers testified that the weapons were inside the vehicle because he was moving them from his grandmother's home to his father's home. The passenger also testified the weapons were on the backseat floorboard, beyond the defendant's reach, and must have shifted during the stop.

The defendant testified he knew the passenger entered the vehicle with the weapons but denied telling police the streets were dangerous; thus, he could not be blamed for carrying weapons. The defendant also denied having possession of or easy access to the weapons.

The second circuit found the evidence was sufficient to establish the defendant had constructive possession of the weapons and intended to possess the weapons so as to support his conviction for possession of firearm by convicted felon. The second circuit further found the weapons remained subject to the defendant's dominion and control by virtue of his knowledge that the weapons were in vehicle as well as the proximity of the weapons to the defendant at time of the stop.

The defendant in the case at bar admitted handling the gun, and the gun holster was visible on the nightstand in the master bedroom where the defendant's identification card was found in the dresser, and men's clothes and shoes were in the closet. The jury chose to believe the defendant handled the firearm found by police thus exerting dominion and control over the firearm. When viewing the evidence in a light most favorable to the prosecution in accordance with the *Jackson* standard, the evidence is sufficient to support the defendant's convictions for possession of a firearm by a convicted felon and possession of a firearm while in possession or a controlled dangerous substance.

## <u>ASSIGNMENT OF ERROR NUMBER ONE</u>

In his first assignment of error, the defendant contends the trial court erred when it did not grant his motion to suppress due to the fact that an illegal search occurred.

The defendant filed a motion to suppress on April 28, 2010. Therein, the defendant alleged the search of the apartment located on Beadle Road was unreasonable because: 1) the address was not the address listed on his parole paperwork; 2) Officer Hardy had never visited him at that address; 3) Officer Hardy searched an area that was not clearly identified as his bedroom; 4) Officer Hardy had no justification for the search; 5) the search was conducted at the home of another, and that person was not home at the time of the search and did not consent to the search; 6) no search warrant was obtained, and no exception to the warrant requirement allowed for a warrantless search. The trial court denied the motion at a hearing held on August 12, 2010.

"A trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent abuse of that discretion." *State v. Wilder*, 09-2322, p. 2 (La. 12/18/09), 24 So.3d 197, 198. Moreover, when reviewing the trial court's decision on a motion to suppress the evidence, this court may look to the entire record, including relevant testimony given at trial. *State v. Sherman*, 04-1019 (La. 10/29/04), 886 So.2d 1116.

In *State v. Malone*, 403 So.2d 1234, 1236-37 (La. 1981), the supreme court discussed warrantless searches stemming from a person's probation or parole status as follows:

> As a general constitutional rule, warrantless searches are per se unreasonable under the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Had defendant not been on probation, we would have no difficulty holding that the Fourth Amendment right to be free from unreasonable searches had

13

been violated. However, defendant was on probation and that status requires that we carefully consider whether and to what extent defendant, as a probationer, had a reasonable expectation of privacy as relates to the type of intrusion involved here. In *State v. Patrick*, 381 So.2d 501 (La.1980), we noted that warrantless searches of a parolee's person and residence by a parole officer have been upheld where the search was reasonable, even though less than probable cause was shown, citing cases from the United States Courts of Appeals for the Second and Ninth Circuits: *United States ex rel. Santos v. New York State Bd. of Par.*, 441 F.2d 1216, 1218 (2nd Cir. 1971), *cert. den.* 404 U.S. 1025, 92 S.Ct. 692, 30 L.Ed.2d 676 (1972); *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir. 1975), *cert. den.* 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130 (1975).

In *Santos*, *supra*, the court considered a warrantless search of a parolee's apartment when the parolee was not at home. The police had received a tip that the parolee was dealing in stolen property and relayed this information to the parole officer. The parole officer and the police went to the parolee's apartment and were admitted by his landlady. The policeman did not assist in the search which resulted in the discovery of stolen goods. In holding that the evidence need not be suppressed, the court reasoned that a parolee is released on the assumption that he will meet the conditions of his parole, one of which is to refrain from violating the law, and that the parole officer is charged with the duty of enforcing the conditions of parole. According to the court, "(t)o hold that evidence obtained by a parole officer in the course of carrying out this duty cannot be utilized in a subsequent prosecution would unduly immunize parolees from conviction." 441 F.2d at 1218.

*Malone* adopted a four part test to determine whether the search of a probationer or parolee's premises is reasonable:

A probationer has essentially the same status as a parolee; in our view both must necessarily have a reduced expectation of privacy. The Fourth Amendment prohibits only *unreasonable* searches. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). As we said in *State v. Patrick, supra*: "The test of reasonableness in cases of this nature depends upon the total atmosphere of each case." 381 So.2d at 503. The *Patrick* opinion then quotes *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447, 481 (1979):

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for

initiating it and the place in which it is conducted." [cites omitted]

To determine whether the search in the instant case was reasonable we must therefore examine the total atmosphere in which it took place. In the words of *Bell v. Wolfish*, *supra*, we must consider (1) the scope of the particular intrusion, (2) the manner in which it was conducted, (3) the justification for initiating it and (4) the place in which it was conducted.

*Id.* at 1238-39.

At the hearing on the motion to suppress, Officer Hardy testified she was the defendant's parole officer. Officer Hardy testified that on July 14, 2009, the defendant told her he worked a couple of days a week in Lafayette and stayed at his girlfriend's house when he was in Lafayette. His girlfriend's address was 169 South Beadle Street, Apartment 268, Lafayette, Louisiana. Officer Hardy testified that she attempted to contact the defendant at his mother's residence on July 15, 28, 30, and 31, 2009. In fact, on July 31, the officer attempted two separate visits at that residence. The address was 813 North Frederick, Kaplan, Louisiana, and was the address given by the defendant.

Because Officer Hardy could not contact the defendant at the Kaplan address, she went to the apartment in Lafayette. On January 5, 2009, Officer Hardy had been contacted by detectives at the Lafayette Police Department who gave her information that the defendant had been seen in possession of a firearm and was involved in narcotics. The detectives also told her they wanted to talk to the defendant regarding a homicide investigation. Prior to entering the apartment, Officer Hardy called either Detective Robin or Suire and told him that, if she made contact with the defendant, she would let him know.

Officer Hardy testified that she attempted to postpone the visit until the detectives arrived, but they did not show up. Officer Hardy testified that she knocked on the door of the apartment at approximately 10:30 a.m., and it was

15

opened by a juvenile male who stated the defendant was sleeping, but he would wake him. She then spoke to the defendant about his supervision fees but did not conduct any kind of search. The two parted, and she returned to her vehicle and circled the parking lot until the detectives arrived. Officer Hardy testified that during her initial visit with the defendant, she saw no suspicious activities in the apartment. Officer Hardy believed she stayed in the front area of the apartment during that time.

Officer Hardy, accompanied by the detectives, again knocked on the apartment door and made contact with the defendant. Officer Hardy told the defendant the detectives wanted to speak to him about a homicide. There is no evidence the defendant voiced any objection to talking to the detectives. Detective Robin then sat down at the kitchen table with the defendant. Officer Hardy was asked if there was any indication the defendant did not want police to enter the apartment, and she stated: "He never said that, no, they could not come in." Officer Hardy further indicated the defendant never told police the apartment was not his or they did not have permission to enter. Officer Hardy testified the apartment was leased by the defendant's girlfriend, she was not present at the time, and she did not consent to the search that was later conducted.

Officer Hardy testified that, once the defendant was seated at the kitchen table, she entered the master bedroom and looked around. Therein, she saw a silver scale commonly used to weigh drugs on the nightstand. Officer Hardy next saw a gun holster on the second shelf of the night stand. She looked in the closet and noted male clothes and shoes were present. She then looked through the closet for, and found, a gun after picking up several blankets. Officer Hardy proceeded to the table and told one of the detectives to handcuff the defendant for safety reasons, because the defendant was not to be in the presence of a weapon.

16

Officer Hardy returned to the bedroom and continued her search. In the second or third drawer of the chest of drawers, Officer Hardy found the defendant's wallet with his identification inside it. Detective Suire found a shoe box containing a pair of women's shoes and thirteen bullets. Officer Hardy then returned to the kitchen and picked up a pack of cigarettes lying on the table next to the defendant and opened it. Therein, she found a marijuana joint.

Officer Hardy returned to the bedroom, where Detective Robin had removed the bottom drawer from the chest of drawers and found two or three bags of marijuana and a black purse. Inside the purse, Officer Hardy found marijuana, two bags containing cocaine, and numerous pills. Officer Hardy also found a bag that contained various pills in a copper shoe on the nightstand.

Officer Hardy had never visited the Lafayette address and had been supervising the defendant since July 11, 2007. Officer Hardy testified she went to the Lafayette address because it was the last day of the month, and the defendant was on her mandatory contact list. She had made five attempts to visit him at the Kaplan address, and he was never there. However, despite having failed to contact the defendant on five prior occasions that month, she had not tried to contact him by phone. When asked what right she had to search a residence, Officer Hardy testified, "Because they're under our jurisdiction and supervision." She further testified that the right to search extended to a parolee's "person, their property, their vehicle, their residence, [and] any and all effects." Officer Hardy testified that a parole officer could search common areas of a residence shared by more than one person. She was then asked if she had to establish that the bedroom she searched was that of the defendant before it was searched. In response, Officer Hardy stated: "I didn't begin searching until I found the scale and the empty gun holster. That's when I began searching."

17

Officer Hardy was asked why she waited to conduct the search, and she replied: "Because, one, I don't normally do searches by myself, and two, if they were wanting to speak to him regarding an unsolved homicide, my safety, I'm not going to do it by myself."

Officer Hardy was subsequently questioned as follows:

Q:    This was a search based upon your parole supervision, and Officers Robin and Suire were merely assisting you; is that correct?

A     Absolutely, yes.

Q     In fact, it's not unusual for you to do a search like this for probation and parole and request that law enforcement come to help you; is that correct?

A     Correct. Well, we normally call law enforcement when narcotics are found.

Officer White testified that the defendant's girlfriend indicated he lived at the apartment. Officer White also spoke to the defendant regarding the drugs found, and the defendant claimed ownership of the drugs and admitted he had handled the gun.

Officer White read the booking paperwork, which indicated the Lafayette CID and Louisiana Probation and Parole conducted a homicide follow-up investigation at the apartment. Detective Robin testified that he had obtained information in January 2009 that the defendant was involved in narcotics and had been seen with a gun. Detective Robin further testified that he relayed this information to Officer Hardy. Detective Robin testified that on July 31, 2009, Officer Hardy called and stated the defendant was at an apartment in Lafayette. When Detective Robin arrived, Officer Hardy was in her car leaving. Detective Robin testified that he was going to the apartment to question the defendant about an ongoing criminal investigation, because the defendant had failed to meet with

18

him on a prior occasion. Detective Robin testified that police did not have a search warrant when they went to the apartment.

Detective Suire testified that Officer Hardy arrived at the apartment complex a short time after he and Detective Robin did. The group then knocked on the door of the apartment. When asked if the defendant told them not to come into the apartment or that he could not give permission for them to enter, Detective Suire stated "No, I don't believe so." Detective Suire testified that he did not know who owned the apartment, and he did not contact the owner about entering the apartment.

Detective Suire testified that after Officer Hardy found the gun, she asked him to assist with the search. Officer Suire further testified that he found narcotics under the bottom drawer of the chest of drawers. Officer Suire testified that he did not recall what type of clothing was in the chest of drawers. When asked if there were men's clothes in the closet, he responded: "[N]ot that I know of."

Barbara Edwards, the defendant's mother, testified that he began living with her when he was paroled, and he continued to reside with her until July 2009. Edwards testified that all of the defendant's belongings were at her home. She also testified that the defendant sometimes babysat at an apartment on Beadle Road. Joseph Edwards, the defendant's father, testified that the defendant lived at his residence and was home at least five or six nights a week. O'Brien testified that the defendant was her boyfriend, and the two had a child together. The defendant babysat for her on July 31, 2009. O'Brien testified the defendant babysat when she worked, and he did not have clothes at her apartment. She indicated the defendant visited his child four times a week. She denied telling police the defendant lived with her. O'Brien testified she was not contacted by police on July 31, 2009, prior to their entry into her apartment.

19

The defendant testified he was at the apartment on July 31, 2009, watching his daughter. He indicated he lived in Kaplan at that time. The defendant admitted that he told Officer Hardy he stayed at the apartment some nights after work.

The defendant testified that in June, Detective Robin told him that if he did not come in to speak to police, he would get Officer Hardy involved. The defendant testified that he was asleep when Officer Hardy arrived at the apartment. He got up, and Officer Hardy looked around, told him he was late on his payments, and left. The defendant then saw the detectives drive up, and the detectives and Officer Hardy came to the door. The defendant testified he told them: "[Y]'all can't come here without no [sic] search warrant." The three entered, and Officer Hardy and one of the detectives went straight to the back and started searching.

The defendant testified that he had prior convictions for murder and illegal use of weapons during the commission of a felony.

After hearing the testimony, the trial court denied the motion to suppress without setting forth any reasons for the ruling.

The defendant contends that Officer Hardy admitted she knew O'Brien leased the apartment, and the defendant did not live there. Additionally, he argues the state put on no evidence that Officer Hardy had a reasonable suspicion that any criminal activity was taking place at the apartment.

The defendant addresses the scope of the intrusion and argues the search was a pretext for allowing detectives to speak to him, there was no evidence of consent to search, and Officer Hardy acknowledged the apartment was leased to O'Brien. The defendant next addresses the manner in which the search was conducted and argues the search was conducted under false pretenses, and Officer Hardy had no authority to conduct a search of the home on her second visit. The defendant then addresses the justification for initiating the search and argues the state offered no

20

justification for initiating the search. Finally, the defendant addresses the place in which the search was conducted and argues the search was conducted in the home of a third person without that person's consent, and Officer Hardy knew he did not have control or dominion over the apartment and could not consent to a search.

The state asserts the sweep of the apartment done by Officer Hardy was for her safety and that of the two detectives. The state additionally asserts the defendant admitted he allowed Officer Hardy in and gave her consent to search the apartment.

Officer Hardy testified the defendant was released on parole on June 21, 2007. At that time, La.R.S. 15:574.4(H) set forth the following:[2]

> H. (1) The Board of Parole may make rules for the conduct of persons heretofore or hereafter granted parole. When a prisoner is released on parole, the board shall require as a condition of his parole that he refrain from engaging in criminal conduct.
>
>    . . . .
>
> (4) The board may also require, either at the time of his release on parole or at any time while he remains on parole, that he conform to any of the following conditions of parole which are appropriate to the circumstances of the particular case:
>
>    . . . .
>
> (m) Will be subject to visits by his parole officer at his home or place of employment without prior notice.
>
>    . . . .
>
> (r) Agree to searches of his person, his property, his place of residence, his vehicle, or his personal effects, or any or all of them, at any time, by the probation officer or the parole officer assigned to him, with or without a warrant of arrest or with or without a search warrant, when the probation officer or the parole officer has reasonable suspicion to believe that the person who is on parole is engaged in or has been engaged in criminal activity since his release on parole.

---

[2]Louisiana parole regulations are applicable to the Defendant pursuant to the Interstate Compact for Adult Supervision. S*ee* www.interstatecompact.org.

In *Cutler v. McGee*, 09-1290, p. 8 (La.App. 3 Cir. 5/5/10), 38 So.3d 481, 487-88, *writ denied*, 10-1879 (La. 11/19/10), 49 So.3d 393, this court stated the following:

> Pursuant to La.R.S. 15:574.4(H), the Board of Parole has the authority to make rules and conditions to which parolees must conform. There is one mandatory condition: parolees must not engage in criminal conduct, La.R.S. 15:574.4(H)(1), but there are eighteen additional permissive conditions, which the Board of Parole "may also require" a parolee to obey, including allowing "searches of his person, his property, his place of residence, . . . with or without a search warrant, when the . . . parole officer has reasonable suspicion to believe that the person . . . is engaged in or has been engaged in criminal activity." La.R.S. 15:574.4(H)(4), (H)(4)(r). The conditions of parole must be explained to a parolee, and he must "agree in writing to such conditions." La.R.S. 15:574.4(F).

In the case at bar, Officer Hardy testified she had the right to search a parolee's residence, "Because they're under our jurisdiction and supervision." She further testified the right to search extended to a parolee's "person, their property, their vehicle, their residence, [and] any and all effects." Although, there was no documentation presented that he had agreed to these conditions, her testimony was unrefuted, and there is sufficient evidence that the defendant's residence was subject to search, as a condition of his parole, when the parole officer has reasonable a suspicion to believe that the defendant was engaged in or had been engaged in criminal activity.

In *State v. Bolden*, 09-33 (La.App. 5 Cir. 5/12/09), 13 So.3d 1168, *writ denied*, 09-1317 (La. 2/5/10), 27 So.3d 297, the defendant also argued the evidence should have been suppressed because the search was conducted at his girlfriend's residence and not the residence listed on his parole plan, and his reduced expectation of privacy did not extend to his girlfriend's residence. The fifth circuit found the record indicated the defendant was residing at his girlfriend's apartment. The parole officer testified the defendant was never at his mother's residence when

he went to visit the defendant even though the address was listed as the defendant's residence on his parole plan. The defendant told his parole officer on January 19, 2006, and January 26, 2006, that he was living with his girlfriend at her apartment, and the officer could visit him there. When the parole officer conducted a residence check on January 31, 2006, the defendant was at the apartment, and the parole officer found some of the defendant's belongings in the apartment. The fifth circuit found that because the defendant resided with his girlfriend, his parole officer had the right to enter the residence and speak to him due to this decreased expectation of privacy.

During the residence check, the defendant and his parole officer spoke in the front room. The defendant then said he had to brush his teeth, which the parole officer thought was odd. The parole officer followed the defendant down the hallway. "At that time he looked 'catty-corner' and saw a gun in plain sight on the bedroom dresser." *Id.* at 1170. Because the defendant had violated his parole by having a gun in his residence, the defendant was handcuffed, and a search of his apartment was conducted. The fifth circuit noted:

> Under the plain view doctrine, if police officers are lawfully in a position from which they view an object that has an incriminating nature which is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. *State v. Manson*, [01-159 (La.App. 5 Cir. 6/27/01),] 791 So.2d [749,] 757. Because the parole officer had the authority to enter defendant's residence due to his status as a parolee, the parole officer had the right to seize the gun he saw in plain view. Since the parole officer then had reasonable suspicion of criminal activity, he was authorized to conduct a thorough search of the apartment. *State v. Saulsby*, [04-880 (La.App. 5 Cir. 12/28/04),] 892 So.2d [655,] 658.

*Id.* at 1172.

Although the defendant and O'Brien denied the defendant lived at the apartment and the defendant's parents testified that he lived with them, the defendant was not at the home of his parents when Officer Hardy stopped by on

23

five occasions during July. Additionally, the defendant told Officer Hardy that he spent several nights a week at his girlfriend's apartment. Moreover, Officer White testified that O'Brien indicated the defendant lived at the apartment. Furthermore, the defendant's identification was found in the chest of drawers in the master bedroom, and Officer Hardy observed men's clothing and a pair of tennis shoes in the closet. When Officer Hardy arrived at the apartment the first time, the defendant was obviously sleeping there. Based on this information, we conclude the defendant resided at the apartment at issue.

Because the defendant was residing at the apartment, the parole officer had the right to conduct a search. She had been provided information that the defendant had been seen in possession of a firearm and was involved in narcotics. The Lafayette detectives wanted to question him in reference to a homicide. She walked into the master bedroom and saw a narcotics scale and an empty gun holster sitting in plain view. The subsequent search, which produced the gun and narcotics was justified in carrying out her duties as a parole officer.

In *State v. Hamilton*, 02-1344 (La.App. 1 Cir. 2/14/03), 845 So.2d 383, *writ denied*, 03-1095 (La. 4/30/04), 872 So.2d 480, the defendant was on parole for a conviction of drug possession. The parole officers and a local detective received a tip from an anonymous informant that the defendant was selling cocaine and there was cocaine in a dresser in his bedroom. The detective contacted one of the parole officers, and the parole officer told the detective he would be performing a residence check at the home and asked for assistance. Later that day, parole officers and police conducted a search of the defendant's home which revealed the presence of cocaine.

In concluding the search was not a subterfuge for a criminal investigation, the first circuit noted the parole officers planned to carry out the residence check

24

from the tip received from the informant before they had contact with the detectives. There was not an ongoing investigation at the time of the search, and the detectives were present to assist the parole officers. The first circuit also found the facts supported a reasonable suspicion that the defendant may have been violating his parole. The parole officer knew of the defendant's previous drug conviction, and the information received from the informant was consistent with the same behavior. The first circuit further found the scope of the search was not unreasonable, stating the following:

> When the defendant arrived home, the agents and officers informed him of the reason for the residence check and the defendant allowed them to enter the home. Before discovering the substance suspected to be cocaine, Agent Phelps limited the search to the master bedroom in accordance with the information received in the tip. Agent Roberts and Sergeant Swann remained in the front of the home with the defendant. The defendant was handcuffed as a precautionary measure. Detective Mistretta and Detective Hover assisted Agent Phelps with the search of the bedroom. Detective Hover located the hidden compartment in the dresser of drawers. Agent Phelps opened the compartment and discovered the substance later determined to be cocaine. As previously discussed, the parole officers' justification for initiating the search arose from their reasonable suspicion that the defendant was in violation of his parole. This reasonable suspicion was based on information received in a tip from a female informant who told the officers where drugs could be specifically located in the defendant's home.

*Id.* at 389.

In the matter before us, we find the parole officer's search of the premises was reasonable and in accordance with the performance of her duties as a parole officer. We do not find the search was a subterfuge for a criminal investigation. Officer Hardy was required to make a "field" visit to the defendant's residence before the end of the month. She only went to the Lafayette residence after five failed attempts to visit him over a two week period of time at the address he had given her in Kaplan. She then went to Lafayette, to the address provided to her by the defendant, and where evidence supports a finding that he was actually living.

25

She had been provided information that the defendant had been seen with a gun, which was a crime since he was a convicted felon. She had also been provided information that he was involved in narcotics. Knowing the Lafayette detectives wanted to question him in reference to a homicide, she contacted them and told them she was attempting a visit at the Lafayette address and would notify them if he was there. When she found him at home, she called them.

Officer Hardy testified that she did not search the apartment the first visit for safety reasons, stating she does not search a premise alone. After the detectives arrived, she reentered the apartment, told the defendant the detectives wanted to talk to him, and then conducted a reasonable search of the area the defendant occupied. Likewise, the search of the cigarette pack was reasonable in light of the circumstances and within her authority under the terms of his parole. We find no error in the trial court's denial of the motion to suppress evidence.

## ASSIGNMENT OF ERROR NUMBER TWO

In his third assignment of error, the defendant contends the trial court erred when it granted his *Batson* challenge but failed to grant him any relief. The defendant mischaracterizes the trial court's ruling. The defendant entered an objection to the state's peremptory challenge of four potential jurors, all of whom were black.

> "In *Batson* [*v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ], the Supreme Court held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person's race." *State v. Anderson*, 06-2987, p. 41 (La.9/9/08), 996 So.2d 973, 1004, *cert. denied*, --- U.S. ----, 129 S.Ct. 1906, 173 L.Ed.2d 1057 (2009) (footnote omitted); *see also State v. Sarpy*, 10-700 (La.App. 3 Cir. 12/8/10), 52 So.3d 1032, *writ denied*, 11-46 (La.6/3/11), 63 So.3d 1006.
>
> > A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory

challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."

*Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 973-974, 163 L.Ed.2d 824 (2006) (citations omitted).

The trial court's findings with regard to a *Batson* challenge are entitled to great deference on appeal. When a defendant voices a *Batson* objection to the State's exercise of a peremptory challenge, the finding of the absence of discriminatory intent depends upon whether the trial court finds the prosecutor's race-neutral explanations to be credible. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."

*Anderson*, 996 So.2d at 1004 (citations omitted).

*State v. Bivens*, 11-156, pp. 18-19 (La.App. 3 Cir. 10/5/11), 74 So.3d 782, 796-97, *writ denied*, 11-2494 (La. 3/30/12), 85 So.3d 115.

In this case, the trial court determined that the defendant had established a systematic exclusion of black veniremen from the jury, the first step in the *Batson* inquiry. It further found that the state gave credible race neutral reasons for exercising challenges as to each potential juror. Therefore, there was no finding of a *Batson* violation. The trial court's findings with regard to a *Batson* challenge are entitled to great deference on appeal. This assignment of error lacks merit.

27

## CONCLUSION

The defendant's convictions and sentences are affirmed. The case is remanded for the trial court to inform the defendant of the delays for seeking post-conviction relief as instructed herein.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**