# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 17-922

**STATE OF LOUISIANA**

**VERSUS**

**JERMAINE CHRISTOPHER OBRIEN**

**A/K/A JERMAINE CHRISTOPHER O'BRIEN**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 16139-16
HONORABLE SHARON D. WILSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN E. CONERY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Marc T. Amy, and John E. Conery, Judges.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, Louisiana 70602**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Jermaine Christopher Obrien a/k/a Jermaine Christopher O'Brien**

**John Foster DeRosier,**
**District Attorney**
**Elizabeth Brooks Hollins,**
**Brett Gaspard, and**
**Jason Trevor Brown,**
**Assistant District Attorneys**
**14th Judicial District Court**
**Post Office Box 3206**
**Lake Charles, Louisiana 70602**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**CONERY, Judge.**

Defendant, Jermaine Christopher Obrien a/k/a Jermaine Christopher O'Brien, was convicted of possession of a weapon by a convicted felon; attempted illegal use of a weapon in the presence of drugs; possession of a Schedule II controlled dangerous substance (cocaine) with intent to distribute; and possession of a Schedule II controlled dangerous substance (cocaine). He was adjudicated a fourth felony habitual offender and was ultimately sentenced under the habitual offender statute to serve forty years at hard labor for possession of a weapon by a convicted felon; twenty years at hard labor for attempted possession of a firearm in the presence of drugs; twenty years at hard labor for possession with the intent to distribute cocaine, and twenty years at hard labor for possession of cocaine, with each sentence was to run concurrently to the others.[1] For the following reasons, we affirm Defendant's convictions and sentences. We find a single error patent and remand that issue to the trial court for remediation.

## FACTS AND PROCEDURAL HISTORY:

On June 14, 2016, at approximately 9:30 a.m., the Calcasieu Parish 911 Center received an emergency call from the resident of 412 N. Simmons Street indicating "he's a walking with that pistol and . . . he's scaring them girls, he got two girls over there . . . he's making them do what he want 'em [sic] to do." When questioned further about the man's name, the caller said, "Jermaine! He live [sic] across the street. That O'Brient [sic] little boy." The caller further stated, "He's walking out there just holding his pistol . . . and scaring them two girls, they [sic] backing up from him." When asked to describe what 'Jermaine' was wearing, the

---

[1] Pursuant to La.R.S. 15:529.1(G), "[a]ny sentence imposed under the provisions of this Section [(Sentences for second and subsequent offenses)] shall be at hard labor without benefit of probation or suspension of sentence."

caller stated "[he] ain't [sic] got nothing but a pair of pants on, no shirt." She insisted she needed the narcotics squad because "that's [(drugs)] all that's over there." Corporal Benjamin Randolph and Corporal Bendy Falcon responded to the call at 409 North Simmons Street, the home of Jermaine O'Brien's parents.

When they arrived, a truck was in the driveway with several occupants. Upon questioning, the occupants directed the officers to the back of the house. The occupants drove away shortly thereafter. When the responding officers rounded the corner to the back of the house, Corporal Randolph saw Defendant Jermaine O'Brien counting a stack of money. He was sitting with his back against a shed that was connected to the main house by a porch. Next to him, "within arm's reach," was a HiPoint .40 caliber handgun. Defendant did not see Corporal Randolph at first.

When he noticed Corporal Randolph, Defendant stood up. Because the handgun was within arm's reach of Defendant, Corporal Randolph drew his gun. Officer Falcon, who was also on scene, then told Defendant to get on the ground. Defendant did not comply. Instead, he gathered the money, stood up, and started walking toward the back door. When he reached the back door, Defendant began pacing back and forth. Finally, he dropped the money and knelt on the ground.

Corporal Randolph secured the gun and gave it to Officer Falcon to clear. When clearing the gun, a bullet was found in the chamber and several bullets were found in the magazine, which had been loaded into the handgun.

Corporal Randolph, who was familiar with Defendant from previous narcotics arrests and knew he was a convicted felon, placed Defendant under arrest for unlawful possession of the gun by a convicted felon. During a search of Defendant's person, five rocks of crack cocaine were found in Defendant's pockets.

2

While handcuffed and after the crack cocaine was found, Defendant ran into the main residence and a taser was used to stop him when he began reaching toward the right leg of his pants. The officers then placed Defendant in the police vehicle. While walking to the police car, Defendant admitted to Corporal Randolph that "all of that's mine except for the gun." He explained: "Somebody from the driveway put the gun there." Because the shed had not yet been searched, Corporal Randolph interpreted this statement to mean only the crack cocaine found in Defendant's pockets belonged to Defendant.

At some point during the arrest, a female, later identified as Defendant's girlfriend, walked out of the shed with four small children. When asked, Defendant's mother told the officers that Defendant did not live in their home but sometimes spent time in the shed. Suspicions aroused, the officers asked for and received written permission from Defendant's mother to search the shed.

Upon entering the single room shed, the officers saw a table, chairs, a television, and several items of men's clothing. The officers testified that, based on their experience in other narcotics cases, they found pink packages that looked like packages of synthetic marijuana on the table. A digital scale and smaller clear plastic bags also containing what resembled synthetic marijuana were also found. Corporal Randolph testified that the small clear baggies resembled the packaging used for resale of narcotics. A metal cylindrical container containing a substance the officers believed was powder cocaine was found on the floor underneath the table. A measuring cup and fork with white powder residue on them, and a microwave plate covered in white powder were also found. Corporal Randolph testified that he had come across these types of items in previous narcotics arrests

when someone was making crack cocaine from powder cocaine. By this time, the narcotics team had arrived and assisted in the search of the shed.

As the officers continued their search, testimony at trial established that the officers found cigarillo cigar boxes, a cup containing marijuana, a second cup containing a bag of what officers believed to be powder cocaine, a teddy bear, and a backpack. The teddy bear had a hole in its back and inside the hole was a clear plastic bag of what was believed to be powder cocaine, another bag containing assorted pills, and a small quantity of white powder also believed to be powder cocaine. The backpack contained several pink packages of presumed synthetic marijuana, clear zip-lock bags, jeweler bags,[2] a grocery bag containing seven unopened packages of synthetic marijuana, and U.S. currency in varying denominations. The officers discovered an Airsoft BB gun, loose ammunition, and a 9mm round. A box of ammunition was located outside.

One of the trained canines used by the officers alerted to the odor of narcotics coming from a silver Buick at the residence. The officers obtained a search warrant for the car. Although owned by Defendant's dad, officers were told that Defendant was the primary driver. In the car, the officers found a rock of crack cocaine on the floorboard, a cigarillo wrapper matching the boxes found in the shed, and a jewelry bag containing synthetic marijuana.

The officers did not search Defendant's parents' home or their persons. Defendant did not enter the shed or handle the gun in the officers' presence that morning.

---

[2] According to the narcotics experts, jeweler or jewelry bags are small clear bags typically used by dealers in the sale of small quantities of drugs.

The total amount of money discovered in the search (including the money Defendant was holding when officers arrived) was three thousand, five hundred and forty-six dollars ($3,546.00). The money was in mixed denominations, which is indicative of drug sales according to Detective Nunez and Corporal Randolph. Ultimately, drug test results were introduced into evidence and confirmed that over 32 grams of powder cocaine, six rocks of crack cocaine, and 103.1 grams of synthetic marijuana were discovered and confiscated.

At trial, Corporals Randolph and Falcon, Detective Jeremy Nunez with the Calcasieu Parish Sheriff's Office combined anti-drug team, Gabrielle Basone, a forensic chemist, Lieutenant Craig Desormeaux with the Lake Charles Police Department communications office, and Robert Broussard, an information technician for the Calcasieu Parish 911 Center testified. The recording of the 911 call was played for the jury.[3] The caller lived across the street from Mr. and Mrs. O'Brien and stated on the 911 recording that Jermaine, who "live [sic] across the street, that O'Brient [sic] little boy" was walking around in nothing but a pair of pants with a pistol, scaring two girls. She further insisted there were drugs "all over there", so the narcotics team needed to investigate.

Detective Nunez described some of the contraband confiscated as "small foil zip packs" containing several grams of drugs, which are then subdivided into grams, placed in smaller baggies, and resold. The pink bags, called "bubble gum," are usually fourteen-gram bags. They are then put into even smaller bags, called jewelry or jeweler bags, for sale to individual users. Detective Nunez explained that digital scales are used by drug dealers to divide drugs into smaller quantities

---

[3] The 911 call was played in two increments. The first half was recorded by the Calcasieu Parish 911 Center and the call was then transferred to the Lake Charles Police Department. The jury heard that "he" was carrying a pistol in his pants and scaring others.

for resale. He also testified that when searching a suspected drug dealer's space, it is normal to find multiple kinds of drugs stashed in various places.

To determine whether an individual is a user or a distributor, narcotics detectives look at the totality of the situation and consider things like the quantity of drugs found, whether resale items (like a scale and small baggies) or individual use paraphernalia (like a pipe) is present, the type of drugs found, and the amount of cash on hand.

Detective Nunez explained to the jury the difference between users, mid-level dealers, high-level dealers, and cartels. He defined cartels as people dealing more than one kilogram of drugs in any given transaction, and they are usually located out of state. High-level dealers were characterized as people who deal between 28 grams and one kilogram. Typically, they are outsourcing from out of state for purchase. Mid-level dealers were defined as having 3.5 grams to half an ounce, which they "break [] down, manufacture cocaine or break it down into powder cocaine, [and] they'll cut the powder cocaine to stretch it." Dealers typically have more than one type of drug on hand as opposed to users, who generally only possess one type. A user is someone who buys one or two rocks or up to a gram of drugs in any given day.

In addition to considering how many different drugs are present and how much of each drug is found, investigators also consider the type(s) of paraphernalia found at the scene. Detective Nunez explained that a user will generally have personal-use paraphernalia like crack pipes and snorting straws, while a dealer will have packaging and weighing materials. Dealers also may have false containers

6

like the teddy bear, or cooking materials like the microwave, measuring cup, and fork.[4]

The officers did not find any individual-use devices on Defendant, in the shed, or in the car. Detective Nunez told the jury that he believed Defendant was a dealer who was manufacturing crack cocaine in the shed. The digital scale, the amount of powder cocaine, the measuring cup, the microwave with its cocaine covered plate, the lack of personal use paraphernalia, the crack rocks in his pocket, the gun, and the cash all formed the basis for his conclusion.

The defense did not call any witnesses. Defendant's counsel introduced certified copies of minutes from 1993 convictions of Defendant's parents for distribution of cocaine. The defense pointed out to the jury that the home, shed, and vehicle belonged to Defendant's parents. He further pointed out that neither of Defendant's parents nor their residence had been searched by investigating officers.

Finally, the parties stipulated to the introduction of certified copies of fingerprints and the minutes of January 24, 2013 convictions of distribution of a Schedule II controlled dangerous substance and possession of a Schedule II controlled dangerous substance (both cocaine), and that Defendant was the same person as the individual convicted on January 24, 2013.

The jury convicted Defendant of: 1) possession of a weapon by a convicted felon, 2) attempted illegal use of a weapon in the presence of drugs, 3) possession of a Schedule II Controlled Dangerous Substance with an intent to distribute, and 4) possession of a Schedule II Controlled Dangerous Substance.

---

[4] Detective Nunez testified that powder cocaine can be cooked to make crack cocaine, which is then broken into pieces for re-sale.

The trial court imposed sentences on each charge on March 3, 2017. The State then filed a habitual offender bill as provided by La.R.S. 15:529.1, which was heard on August 10, 2017. At the habitual offender hearing, the trial court found Defendant to be a fourth felony habitual offender. It also found deviation from the mandatory life sentence was appropriate. At the time Defendant was billed as a fourth felony habitual offender, La.R.S. 15:529.1(A)(4)(c) mandated a life sentence without benefit of parole, probation, or suspension of sentence "[i]f the fourth felony and the two prior felonies are felonies defined as . . . a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for ten years or more."

In 2017, the Louisiana legislature revised the habitual offender sentencing structures and removed the life sentence requirement for fourth felony offenders with underlying drug convictions. The amendment became effective on November 1, 2017. Even though not yet in effect, the trial court sentenced Defendant in accordance with the November 1, 2017 sentencing guidelines. The trial court found the legislative re-structuring was "a legislative declaration that the [life] sentence would be excessive for someone with . . . [only] drug-related priors." The trial court explained that "there is a legitimate goal in society to punish someone who is a chronic drug offender" but further explained that "a punishment should be commensurate with someone's culpability and fare [sic] under the circumstances." The trial court stated, "this Court is required under [its] oath to deviate from the mandatory sentence."

The trial court vacated its March 3, 2017 sentences and re-sentenced Defendant to forty years at hard labor for possession of a weapon by a convicted felon; twenty years at hard labor for attempted possession of a firearm in the

8

presence of drugs; twenty years at hard labor for possession with the intent to distribute cocaine; and twenty years at hard labor for possession of cocaine.[5]  The court ordered each sentence to run concurrently with each other and that Defendant be given credit for any time served since June 14, 2016, for these offenses.  The court recommended Defendant participate in any treatment or life skills programs available during his incarceration.

**ASSIGNMENTS OF ERROR:**

1.  The evidence admitted at the trial of this case, when viewed under the *Jackson v. Virginia* standard, was insufficient to prove beyond a reasonable doubt that Jermaine O'Brien was in actual or constructive possession of a firearm on or about June 14, 2016.

2.  The evidence admitted at the trial of this case, when viewed under the *Jackson v. Virginia* standard, was insufficient to prove beyond a reasonable doubt that on or about June 14, 2016, Jermaine O'Brien attempted to use, possess, or have under his immediate control a firearm, while committing or attempting to commit a crime of violence or while in the possession of or during the sale or distribution of a controlled dangerous substance.

3.  The evidence admitted at the trial of this case, when viewed under the *Jackson v. Virginia* standard, was insufficient to prove beyond a reasonable doubt that Jermaine O'Brien was in actual or constructive possession of cocaine with the intent to distribute the cocaine, on or about June 14, 2016.

4.  Multiple punishment for both possession of cocaine with the intent to distribute and possession of cocaine arising from the same act or transaction is a violation of the Double Jeopardy Clause.

5.  Counsel rendered ineffective assistance which prejudiced Appellant by permitting the introduction of inadmissible hearsay and evidence in violation of Appellant's right of confrontation, and in failing to object to the State's improper closing and rebuttal arguments.

---

[5] During sentencing, the trial court did not expressly specify whether Defendant's sentence was to be served with or without benefits.  However, the trial court did state "[h]e" stands convicted of the offenses charged and he stands proven a multiple offender.  Louisiana Revised Statutes 15:529.1(G) expressly provides: "[a]ny sentence imposed under the provisions of this Section shall be at hard labor without benefit of probation or suspension of sentence."  Thus, Defendant's sentence is to be served without benefits.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, after reviewing the record, we find one error patent.[6]

The record before this court does not indicate that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court is directed to inform Defendant of the provisions of Article 930.8 by sending appropriate written notice to Defendant by certified mail, return receipt requested, within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice. *See State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163; *State v. Fontenot*, 616 So.2d 1352 (La.App. 3 Cir.), *writ denied*, 623 So.2d 1334 (La.1993).

**ASSIGNMENTS OF ERROR ONE AND TWO:**

**Standard of Review:**

We review sufficiency of evidence claims to determine whether, after reviewing the entire record and "viewing the evidence in the light most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Lapoint*, 16-187, p. 2 (La.App. 3 Cir. 9/28/16), 202 So.3d 593, 596, *writ denied*, 16-2087 (La. 9/22/17), 227 So.3d 824. Our role is to ensure sufficient evidence for the conviction exists in the record. Unless we find the evidence in the record does not support the conviction, we can

---

[6]Defendant's charge in count three was possession with the intent to distribute cocaine. Attempted possession with intent to distribute cocaine was provided as a responsive verdict on the verdict sheet given to the jury. The written jury verdict for count three simply states, "guilty of CDS II, cocaine with intent to distribute" making it unclear as to whether the jury convicted Defendant of possession or attempted possession. However, the verdict was clarified when the minute clerk read the verdict as "guilty of possession of CDS II, cocaine, with intent to distribute" and the foreman indicated this was their verdict. Therefore, we do not consider this an error patent.

only impinge on the jury's discretion "to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). We are not called to weigh the evidence and ask if we believe the evidence established guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). We are constrained from second guessing credibility and evidentiary determinations of the jury. *See Lapoint*, 202 So.3d 593. Absent internal contradiction or irreconcilable conflict with the physical evidence, a witness's testimony alone—when believed by the fact-finder— can sufficiently support a guilty verdict. *Id.*

In the first two assignments of error, Defendant challenges the sufficiency of the evidence supporting his convictions for possession of a firearm by a convicted felon and attempted possession of a firearm while in possession of a Schedule II controlled dangerous substance. Defendant contends he never directly or constructively possessed the firearm and asks that we overturn those convictions.

**Possession of a Firearm by a Convicted Felon (La.R.S. 14:95.1 violation):**

The offense of possession of a firearm by a convicted felon is defined in La.R.S. 14:95.1, which provides in pertinent part:

> A. It is unlawful for any person who has been convicted of . . . any violation of the Uniform Controlled Dangerous Substances Law which is a felony . . . to possess a firearm or carry a concealed weapon.
>
> . . . .
>
> D. For the purposes of this Section, "firearm" means any pistol, revolver, rifle, shotgun, machine gun, submachine gun, black powder weapon, or assault rifle which is designed to fire or is capable of firing fixed cartridge ammunition or from which a shot or projectile is discharged by an explosive.

Recently, this court acknowledged the proof necessary to support a conviction for possession of a firearm by a convicted felon:

11

The State must prove beyond a reasonable doubt that 1) the defendant possessed a firearm; 2) the defendant has a previous conviction for one of the enumerated felonies; 3) the ten-year cleansing period for the prior conviction had not elapsed at the time of possession; and 4) the defendant had the general intent to commit the crime.

*State v. Sinegal*, 17-527, 2017 WL 6350261, at *10 (La.App. 3 Cir. 12/13/17) (citations omitted). Defendant only appeals the finding of possession of a firearm, so we will not address factors 2-4.

This court has determined that actual possession of a firearm is not necessary to satisfy the possession element; constructive possession is sufficient. *See State v. Edwards*, 12-891, (La.App. 3 Cir. 2/6/13), 107 So.3d 883. Constructive possession occurs when "a thing [is] subject to [the defendant's] dominion and control." *Id*. at 888 (quoting *State v. Lee,* 02–704, p. 5 (La.App. 5 Cir. 12/30/02), 836 So.2d 589, 593, *writ denied,* 03–535 (La.10/17/03), 855 So.2d 755 (footnotes omitted)). Even when dominion over a weapon is temporary or control is shared, constructive possession of the weapon can still be found if evidence supports "the offender was aware that a firearm was in his presence, and that he had the general criminal intent to possess the weapon." *Id*.

"Guilty knowledge is an essential element in proving constructive possession [of a firearm] and may be inferred from the circumstances." *State v. Fobb*, 11-1434, p. 12 (La.App. 3 Cir. 6/6/12), 91 So.3d 1235, 1244 (quoting *State v. Brooks,* 99–478, pp. 4–6 (La.App. 3 Cir. 12/8/99), 756 So.2d 336, 339, *writ denied,* 00–1492 (La.5/25/01), 792 So.2d 750). "'Constructive possession entails an element of awareness or knowledge that the firearm is there and the general intent to possess it.'" *Fobb*, 91 So.3d at 1244 (quoting *State v. McKinney,* 44,269, p. 7 (La.App. 2 Cir. 5/13/09), 12 So.3d 422, 426). "'[M]ere presence of a defendant in the area of the contraband or other evidence seized alone does not

prove that he exercised dominion and control over the evidence and therefore had it in his constructive possession.'" *State v. Johnson*, 03-1228, p. 6 (La. 4/14/04), 870 So.2d 995, 998-1000 (quoting *State v. Walker,* 369 So.2d 1345, 1346 (La.1979)).

The supreme court has broadly interpreted constructive possession. In *Johnson*, a handgun was found on the floorboard of a vehicle where Johnson's feet had been before he was removed from the car. Testimony revealed that no one saw Johnson with the gun and the vehicle did not belong to Johnson. Additionally, another occupant of the vehicle claimed ownership of the gun and testified that she attempted to hide the gun before exiting the vehicle. The supreme court reversed the appellate court's decision to overturn Johnson's conviction for possession of a firearm by a convicted felon, stating:

> The evidence presented by the State was sufficient to prove that the defendant was *in fact* in possession of the weapon and that this possession was enough to sustain a conviction on the charge of a felon in possession of a firearm, La. R.S. 14:95.1. . . . In this matter, the jury made a credibility determination and found [two witnesses'] accounts unconvincing. Consequently, it was inappropriate for the court of appeal to impinge on the fact finder's discretion to rely instead on the testimony of [a third witness] absent a showing that the defendant was not granted the fundamental due process of law.

*Johnson*, 870 So.2d at 998-1000 (citations omitted) (emphasis in original). General intent "is a fact question which 'may be inferred from the circumstances of a transaction.'" *Edwards*, 91 So.3d 1234 (quoting *State v. Johnson,* 09–862, (La.App. 3 Cir. 2/3/10), 28 So.3d 1263, 1267).

In the present case, Defendant challenges the State's proof that he possessed the firearm in question. Defendant argues that no one testified to seeing him in actual possession of the weapon recovered by Corporal Randolph. Defendant asserts "there was no evidence to support the validity of the [911] call" to which

the officers responded. Defendant also asserts the officers arrived on the scene six minutes after the 911 call, at which time he was not walking around with a pistol. Without elaboration, Defendant asserts that the weapon described in the 911 call was different than the one seized and the 911 caller's comments that "Jermaine" was in actual possession of a weapon could not be used as substantive evidence to establish possession of the weapon at issue.

Defendant further argues that his mere presence near the weapon was insufficient to prove that he exercised dominion and control over the weapon, specifically noting that he did not advance toward the weapon. Although Defendant acknowledged there was a weapon when he told police officers everything was his but the gun, Defendant minimizes his acknowledgment by noting that the statement was made after the officers had seized and cleared the weapon in Defendant's presence. Finally, Defendant notes that several other people were in the vicinity of the gun.

In its brief, the State asserts that Defendant demonstrated guilty knowledge of the firearm when he disobeyed Corporal Falcon's command to get on the ground and instead picked up his money, walked to the back door of the residence, and began pacing back and forth. The State asserts Defendant exercised dominion and control over the firearm because it was loaded and less than a foot away from him.

Considering the facts presented in this case and the jurisprudence, the evidence was sufficient to prove Defendant constructively possessed the firearm at issue herein. A 911 caller had reported seeing Defendant with a gun several minutes before Corporal Randolph saw Defendant with a gun within a foot of his person. Corporal Randolph believed Defendant had access to the gun and testified that it was within arm's reach. The gun was also uncovered, which indicates

14

Defendant was aware of the gun's presence. Defendant's statement that the gun was not his also evidenced his knowledge of the gun's presence. The jury heard testimony that other people were near the gun and heard Corporal Randolph say Defendant denied ownership of the gun. Obviously, the jury rejected these hypotheses of innocence. Considering Defendant's reluctance to submit to Corporal Randolph's commands, the 911 caller's statement that Defendant was in possession of a pistol minutes before Corporal Randolph saw Defendant within arm's reach of a gun, and the unobstructed view of the gun, we find the evidence was sufficient for the jury to find Defendant constructively possessed the firearm.

**Attempted illegal use of a weapon in the presence of drugs (La.R.S. 14:95(E) violation):**

Defendant was charged with illegal use of a weapon in the presence of drugs in violation of La.R.S. 14:95(E). However, the jury returned the responsive verdict of attempted illegal use of a weapon in the presence of drugs.

When a jury returns a responsive verdict, sufficiency of the evidence claims are reviewed for evidence supporting the essential elements of the greater offense, "whether or not the evidence supports the conviction of the responsive verdict returned by the trier of fact." *State v. Jeter*, 09-1004, pp. 2-3 (La.App. 3 Cir. 4/7/10), 33 So.3d 1041, 1043 (quoting *State v. Savoy*, 08–716 (La.App. 3 Cir. 12/10/08), 999 So.2d 285). Because the jury returned a responsive verdict of attempted illegal use of a weapon in the presence of drugs, which is a lesser offense than illegal use of a weapon in the presence of drugs, we look to the essential elements of the latter to determine whether sufficient evidence for conviction of the former exists in the record.

15

At the time the offense was committed (June 14, 2016), La.R.S. 14:95(E) (emphasis added) provided in pertinent part:

E. If the offender *uses, possesses, or has under his immediate control* any firearm . . . while in the possession of or during the sale or distribution of a controlled dangerous substance, the offender shall be fined not more than ten thousand dollars and imprisoned at hard labor for not less than five nor more than ten years without the benefit of probation, parole, or suspension of sentence. Upon a second or subsequent conviction, the offender shall be imprisoned at hard labor for not less than twenty years nor more than thirty years without the benefit of probation, parole, or suspension of sentence.

The trial court included the La.R.S. 14:95(E) definition in its instructions to the jury.

To convict a defendant of violating La.R.S. 14:95(E), "the State [is] required to prove beyond a reasonable doubt that Defendant: '(1) knowingly or intentionally possessed any firearm or other instrumentality customarily used o[r] intended for probable use as a dangerous weapon, while at the same time (2) knowingly or intentionally possessing a controlled dangerous substance.'" *State v. Thompson*, 06-474, p. 2 (La.App. 3 Cir. 11/8/06), 943 So.2d 621, 623, *writ denied*, 06-2959 (La. 9/14/07), 963 So.2d 993 (quoting *State v. Blanchard,* 99-3439, (La. 1/18/01), 776 So.2d 1165).

The supreme court has determined that when use or actual possession cannot be established (for instance, when the defendant is in constructive possession of the firearm), "the state must prove more tha[n] mere possession of the firearm. It must prove some connection between the firearm possession and the drug offense" to meet its burden of proving a defendant violated La.R.S. 14:95.1. *Blanchard*, 776 So.2d 1173.

When both the drugs and the gun were in the defendant's immediate control before being questioned by an officer, the State was not required to prove a nexus

between possession of a gun and possession of drugs even though the defendant was not in actual possession of the gun at the time of questioning. *See Thompson*, 943 So.2d 621. The State was, however, "required to prove [the defendant] knowingly possessed the gun and the drugs." *Thompson*, 943 So.2d at 627. In *Thompson*, this court found that "the evidence prove[d the d]efendant had knowledge that the gun was in his vehicle, as he informed police of its location. Additionally, the evidence prove[d the defendant] had guilty knowledge of the drugs." *Id*. At 627. The *Thompson* court concluded that "the evidence, when viewed in the light most favorable to the prosecution, proves beyond a reasonable doubt that [the d]efendant knowingly or intentionally possessed a gun while knowingly or intentionally possessing cocaine."

Similarly, Defendant had constructive possession of the gun and actual possession of drugs immediately before his arrest. Thus, the State did not need to prove a nexus between the two. They only had to prove Defendant had knowledge of the drugs and the gun. The evidence is clear that Defendant knew he was in possession of drugs at the time of the offense because five rocks of crack cocaine were found in his pocket. The evidence also indicates Defendant was well aware of the gun because he told officers it wasn't his when walking to the police car. For the reasons discussed in conjunction with Defendant's constructive possession of the firearm, the evidence was sufficient to prove the firearm was in Defendant's immediate control and that he was in constructive possession of the gun while he was in actual possession of the drugs. We affirm Defendant's conviction and sentence for attempted possession of a firearm while in the presence of a controlled dangerous substance.

17

## ASSIGNMENT OF ERROR NO. 3:

Defendant asserts the evidence was insufficient to prove he was in actual or constructive possession of cocaine with the intent to distribute. To determine whether a defendant possessed an illegal drug with intent to distribute, courts are to consider:

> whether: (1) [the defendant] ever distributed or attempted to distribute the substance; (2) the substance was in a form typically associated with possession for distribution; (3) the amount created a presumption of the intent to distribute; (4) expert or other testimony showed the amount was inconsistent with personal use; and (5) any paraphernalia associated with the intent to distribute was present.

*State v. James*, 16-522, pp. 5-6 (La.App. 3 Cir. 4/5/17), 216 So.3d 117, 123. "Evidence of prior acts of distribution [are] admissible on the question of specific intent." *State v. Hill*, 11-2585, p. 1 (La. 3/9/12), 82 So.3d 267, 267. "[E]vidence of other drug sales is of great probative value in establishing intent to distribute when it is an essential element of the crime charged." *Hill*, 82 So.3d at 267-68 (quoting *State v. Grey*, 408 So.2d 1239, 1242 (La1982)).

Five rocks of crack cocaine were found in Defendant's pocket. At the time he was approached by officers, Defendant was counting money and was in constructive possession of a loaded gun. Individual use paraphernalia was not found at the scene, but paraphernalia used for packaging and re-sale was found in the shed near the location at which Defendant was first observed, and in the car that Defendant used as the primary driver. The person seen walking out of the shed was Defendant's girlfriend. Defendant's mother stated that Defendant hung out in the shed every once in a while, and adult male clothing was found in the shed. A search of Defendant's parents' car yielded crack cocaine under the driver's seat, a baggie containing suspected synthetic cannabinoids like the baggies

18

found in the shed, and a cigarillo wrapper that was the same brand as the cigarillo cigar boxes found in the shed.

According to expert testimony, the narcotics, paraphernalia, and money found in the shed were consistent with packaging for resale, not personal use. Based on what was found in the shed, Detective Nunez opined that Defendant was manufacturing crack cocaine to sell and was selling powder cocaine. Finally, Defendant's prior convictions for distribution of cocaine and possession of cocaine were introduced into evidence to prove he was a convicted felon for purposes of proving intent to sell and possession of a firearm by a convicted felon.

The evidence was sufficient to find Defendant possessed the five rocks of cocaine on his person with the intent to distribute. For the foregoing reasons, this assignment lacks merit.

**ASSIGNMENT OF ERROR NO. 4:**

Defendant asserts his convictions for possession of cocaine with the intent to distribute (count three) and possession of cocaine (count four) arose from the same act or transaction and violated his protection against double jeopardy. "'It is unconstitutional to place a person twice in jeopardy of life or limb for the same offense.'" *State v. Hampton*, 17-383, p. 12 (La.App. 3 Cir. 11/15/17) (unpublished opinion) (quoting *State v. Steele*, 387 So.2d 1175 (La.1980)).[7] "'The guarantee against double jeopardy provides three central constitutional protections' one of which is 'protection against multiple punishments for the same offense.'" *Id.* (quoting *State v. Brown*, 42,188, 42,189, 42,190, p. 38 (La.App. 2 Cir. 9/26/07), 966 So.2d 727, 755).

_____

[7] *State v. Hampton* is cited at 2017 WL 5477610.

In reviewing double jeopardy claims, Louisiana courts are to apply the standard established by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, (1932). *See State v. Frank*, 16-1160 (La. 10/18/17), —— So.3d ——, 2017 WL 4681941. "Under the *Blockburger* test, there is no double jeopardy . . . where each provision requires proof of an additional distinct element that the other does not." *State v. Cooley*, 11-959, p. 12 (La.App. 3 Cir. 4/4/12), 87 So.3d 285, 295. "'[A] defendant can be convicted of two offenses arising out of the same criminal incident if each crime contains an element not found in the other.'" *Hampton*, p. 12.

Louisiana's system of general verdicts allows jurors to "take alternate routes to the same end according to individual juror's perceptions of what the state did or did not prove at trial." *State v. Pegues*, 10-1626, p. 8 (La. 2/18/11), 56 So.3d 223, 228. Because it provides that discretion to the jury and jurors are unable to explain their underlying thought processes in reaching their verdicts, "the double jeopardy analysis in cases such as the present one necessarily proceeds on the same purely objective level that a due process inquiry into the sufficiency of the evidence supporting the verdicts also takes place." *Id.*

A double jeopardy inquiry is to proceed on a purely objective level. *Pegues*, 56 So.3d 223. In the instant case, the jury was presented with evidence of multiple sources of cocaine from which it could have convicted Defendant of possession of cocaine and possession with the intent to distribute cocaine. *See State v. Cosey*, 11-774 (La.App. 3 Cir. 2/1/12) (unpublished opinion).[8] For the foregoing reasons, this assignment lacks merit.

---

[8]This case is cited at 2012 WL 280632.

20

**ASSIGNMENT OF ERROR NO. 5:**

Defendant asserts his counsel was ineffective for failing to object to the admission of the 911 tape and for failing to object to the State's improper closing argument. Effective assistance of counsel is guaranteed to criminal Defendants by the U.S. Constitution. *See State v. Bright*, 98-398 (La. 4/11/00), 776 So.2d 1134, *reversed on other grounds*, 02-2793, 03-2796 (La. 5/25/04), 875 So.2d 37.

> To establish a claim of ineffective assistance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, that counsel's professional errors resulted in prejudice to the extent that it undermined the functioning of the adversarial process and rendered the verdict suspect. This does not mean "errorless counsel [or] counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance."

*Bright*, 776 So.2d at 1157 (citations omitted).

On appeal, Defendant asserts that his trial counsel should have objected to the 911 tapes because he was denied the right to confront the caller, the recording was inadmissible hearsay, and the recording contained inadmissible bad acts. A trial court's ruling on the admissibility of evidence will not be disturbed on appeal absent a clear abuse of the trial court's discretion. *State v. Bell,* 05–0808, p. 12 (La.App. 4 Cir. 12/6/06), 947 So.2d 774, 781.

Confrontation of caller:

The Confrontation Clause of the Constitution gives defendants the right to confront anyone testifying against them. However, not all statements are testimonial in nature and if nontestimonial, the statements can be admissible even if the person who made the statement is not available to testify at trial. The United States Supreme Court has found that in certain circumstances, recordings of 911 calls can be nontestimonial and therefore admissible. *See Davis v. Washington,*

547 U.S. 813, 126 S.Ct. 2266, (2006). In *Davis*, 547 U.S. at 822, 126 S.Ct. at 2276 the Supreme Court explained that "[a] 911 call, . . . at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." It explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.

*Id*. at 822, 2273-74.

The 911 call in the present case was made to report a crime and assist police in responding to an ongoing emergency (Defendant's alleged acts of scaring girls with a gun). Thus the 911 call in the present case was nontestimonial in nature and did not violate Defendant's confrontation rights.

Inadmissible hearsay:

Defendant also alleges the recorded 911 call was inadmissible hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code Evid. art. 801(C). Hearsay statements are inadmissible "except as otherwise provided by the Code of Evidence or other legislation." La. Code Evid. art. 802. One of the hearsay exceptions is the "excited utterance" exception. An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." La.Code Evid. art. 803(2).

Recordings of 911 calls in which the caller was experiencing or witnessing the event first-hand (as opposed to relaying information provided by another

22

person) have been considered "excited utterances" and hearsay exceptions. *See Falkins*, 146 So.3d at 849-51. Similarly, the 911 call in the present case could be considered an excited utterance and an exception to the hearsay rule. The caller related events as she saw them happening or shortly thereafter. The caller was clearly still under the stress of seeing Defendant walking around with a pistol and scaring others. Thus, the 911 call in the present case was admissible under the "excited utterance" exception to the hearsay rule, and Defendant fails to prove his trial counsel erred in failing to object to its admissibility.

Other crimes evidence:

Finally, Defendant asserts the 911 call should have been objected to by trial counsel because it contained inadmissible other crimes evidence—namely statements that females were threatened while Defendant was carrying a weapon. Evidence of other crimes, wrongs, or acts of a defendant are generally inadmissible. La.Code Evid. art. 404(B)(1). However, the State can introduce other-crimes evidence when the conduct "constitutes an integral part of the act or transaction that is the subject of the present proceeding[,]" which is the *res gestae* exception.

> The Louisiana Supreme Court has interpreted the *res gestae* exception broadly, concluding that the exception includes "not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances." *State v. Colomb,* 98–2813, pp. 3–4 (La.10/1/99), 747 So.2d 1074, 1075–1076 (quoting *State v. Molinario,* 383 So.2d 345, 350 (La.1980)).

*Falkins*, 146 So.3d at 851-52.

The caller's reference to this incident was part of the integral act of the event she was reporting to police and indicated the urgency of her request for police

presence.   We find no abuse of discretion by the trial court in admitting the recordings of the 911 call into evidence.

Improper closing argument:

Finally, Defendant asserts that his trial counsel was ineffective for failing to object to improper closing argument by the State in which it described Defendant's father as being ill and bedridden.   The specific statement made was:

> The defense is actually pushing his own parents, blaming them, without even calling them to the witness stand.  Extraordinary.  Never seen that before.  When you have somebody never even given an opportunity to defend themselves.  You wouldn't even get to hear that his father is ill and was bedridden. You wouldn't get to hear that his mother - - that they were born in 1958, that they're almost 60 years old.  You wouldn't get to hear anything about that.

However, the proper remedy for improper argument would have been to request a mistrial under La.Code Crim.P. art. 771.  Addressing a similar ineffective assistance of counsel claim for failing to object to an improper argument or ask for a mistrial, a panel of this court stated the following:

> Had defense counsel objected to each of the statements above, the only remedy available to defense counsel would have been to ask for an admonition or mistrial under La.Code Crim.P. art. 771.
>
> . . . .
>
> Mistrial is a drastic remedy, and the determination of whether prejudice to the defendant has resulted from the prosecutor's comments lies in the sound discretion of the trial judge. *State v. Leonard,* 2005–1382 p. 11 (La.6/16/06), 932 So.2d 660, 667. Moreover, a trial judge has broad discretion in controlling the scope of closing argument. *State v. Prestridge,* 399 So.2d 564, 580 (La.1981). Although prosecutors are allowed wide latitude in choosing closing argument tactics, they should not misstate the evidence. However, even if the prosecutor exceeds the bounds of closing argument, this court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict. *State v. Martin,* 1993–285 p.

18 (La.10/17/94), 645 So.2d 190, 200, *cert. denied*, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995).

*State v. Hypolite*, 13-1365, pp. 27-29 (La.App. 3 Cir. 5/14/14), 139 So.3d 687, 705, *writ denied*, 14-1242 (La. 1/23/15), 159 So.3d 1056.

Defendant has failed to show that the comment about Defendant's father warranted a mistrial. Moreover, considering the vast amount of evidence adduced at trial, including the evidence of Defendant's constructive possession of the gun, possession of crack cocaine, and possession with intent to distribute the narcotics found on the premises, the State's comment was not sufficiently prejudicial to convince this court that the statement influenced the jury and contributed to the jury's verdict. We find no merit in Defendant's ineffective assistance of counsel argument.

## CONCLUSION:

The convictions and sentences of Defendant, Jermaine Christopher Obrien are affirmed. The trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and is further directed to file written proof of Defendant's receipt of the notice into the record.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**