# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 22-434


**STATE OF LOUISIANA**

**VERSUS**

**BRIAN M. BONIER**


**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C-29755
HONORABLE DESIREE D. DYESS, DISTRICT JUDGE

**********

**JONATHAN W. PERRY
JUDGE**

**********

Court composed of Elizabeth A. Pickett, Jonathan W. Perry, and Ledricka J. Thierry, Judges.


**CONVICTION AFFIRMED;
SENTENCE AFFIRMED AS AMENDED;
REMANDED WITH INSTRUCTIONS.**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, Louisiana  70502**
**(337) 366-8994**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Brian M. Bonier**


**Billy Joe Harrington**
**District Attorney, Tenth Judicial District**
**Clifford R. Strider, III**
**Assistant District Attorney**
**Post Office Box 838**
**Natchitoches, Louisiana  71457**
**(337) 256-6246**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**PERRY, Judge.**

Brian M. Bonier ("Defendant") appeals his conviction and the sentence imposed in connection therewith. For the following reasons, we affirm Defendant's conviction; we amend Defendant's sentence by deleting the $2,500.00 fine; and we remand this matter to the trial court with instructions to amend the minutes of sentencing accordingly.

## FACTS AND PROCEDURAL HISTORY

On February 17, 2020, Defendant was a passenger in a vehicle stopped by the Natchitoches Parish Sheriff's Office for a traffic offense. Deputies found a gun under the passenger seat. As a result, Defendant was arrested for being in possession of a firearm by a convicted felon as he had previously been convicted of possession of methamphetamine.

On March 17, 2020, Defendant was charged by bill of information with possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1. The bill was amended on September 14, 2021, to include a more specific reference to Defendant's prior felony conviction. Jury selection began on November 15, 2021, and Defendant was unanimously found guilty as charged on November 16, 2021.

The State filed a bill of information charging Defendant as a habitual offender on November 18, 2021. On November 24, 2021, Defendant filed a pro se Motion for Appeal. The motion was granted on November 29, 2021. However, on January 6, 2022, the trial court advised Defendant the filing was premature.

On January 6, 2022, Defendant was sentenced to sixteen years at hard labor without benefit of parole, probation, or suspension of sentence. The trial court further ordered Defendant to pay a fine of $2,500.00. Thereafter, the State filed an amended habitual offender bill.

On January 27, 2022, Defendant filed a pro se motion to reconsider sentence, which was denied on January 31, 2022. On February 3, 2022, Defendant was adjudicated a third felony offender. His prior sentence was vacated, and he was ordered to serve twenty years at hard labor without benefit of probation, parole, or suspension of sentence. The trial court further ordered Defendant to pay a fine of $2,500.00.

## APPELLANT'S ASSIGNMENTS OF ERROR

Defendant is now before this court asserting four assignments of error:

1. The State failed to sufficiently prove that Brian Bonier was guilty of Felon in Possession of a Firearm.

2. The trial court abused its discretion in denying the motion for a mistrial during opening statements. The court's ruling that the State was allowed to tell the jury about inculpatory statements allegedly made by Brian Bonier because they were "res gestae" is legally incorrect. Because the inculpatory statements had not been deemed admissible prior to opening statements, a mistrial should have been granted.

3. Trial counsel provided ineffective assistance of counsel. In a case with a questionable stop, search, and inculpatory statement, counsel was deficient in his representation by not filing motions to suppress the gun and alleged statement. Counsel's failure to contemporaneously object to the admission of this evidence compounded the ineffective representation.

4. The trial court's sentence, imposing a fine of $2,500, was excessive after the court found Brian Bonier guilty of the habitual offender bill and resentenced him in accordance with that statute.

## DISCUSSION

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one error patent regarding the legality of the sentence imposed. Since the error is raised in Assignment of Error Number four, we will address it as an assigned error.

2

<u>*Sufficiency of Evidence*</u>

In his first assignment of error, Defendant contends the State failed to sufficiently prove he was guilty of the charged offense.

> When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Sylvia*, 01-1406, p. 2 (La.4/9/03), 845 So.2d 358, 361; *State v. Captville*, 448 So.2d 676, 678 (La.1984). Therefore, the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proved beyond a reasonable doubt. *Sylvia*, 01-1406 at p. 2-3, 845 So.2d at 361; *Captville*, 448 So.2d at 678. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." *Sylvia*, 01-1406 at p. 2-3, 845 So.2d at 361 (citing *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988)).

*State v. Johnson*, 03-1228, pp. 4-5 (La. 4/14/04), 870 So.2d 995, 998.

> [F]or the defendant to be convicted of possession of a firearm by a convicted felon: "[T]he State must prove beyond a reasonable doubt: (1) the possession of a firearm; (2) a previous conviction of an enumerated felony; (3) absence of the ten-year statutory period of limitation; and, (4) general intent to commit the offense." *State v. Recard*, 97-754, p. 9 (La.App. 3 Cir. 11/26/97), 704 So.2d 324, 329, *writ denied*, 97-3187 (La.5/1/98), 805 So.2d 200.

*State v. Johnson*, 09-862, p. 3 (La.App. 3 Cir. 2/3/10), 28 So.3d 1263, 1267.

> This court has determined that actual possession of a firearm is not necessary to satisfy the possession element; constructive possession is sufficient. *See State v. Edwards*, 12-891, (La.App. 3 Cir. 2/6/13), 107 So.3d 883. Constructive possession occurs when "a thing [is] subject to [the defendant's] dominion and control." *Id.* at 888 (quoting *State v. Lee*, 02-704, p. 5 (La.App. 5 Cir. 12/30/02), 836 So.2d 589, 593, *writ denied*, 03-535 (La. 10/17/03), 855 So.2d 755 (footnotes omitted) ). Even when dominion over a weapon is temporary or control is shared, constructive possession of the weapon can still be found if evidence supports "the offender was aware that a firearm was in his presence, and that he had the general criminal intent to possess the weapon." *Id.*

> "Guilty knowledge is an essential element in proving constructive possession [of a firearm] and may be inferred from the

circumstances." *State v. Fobb*, 11-1434, p. 12 (La.App. 3 Cir. 6/6/12), 91 So.3d 1235, 1244 (quoting *State v. Brooks*, 99-478, pp. 4-6 (La.App. 3 Cir. 12/8/99), 756 So.2d 336, 339, *writ denied*, 00-1492 (La. 5/25/01), 792 So.2d 750). ' "Constructive possession entails an element of awareness or knowledge that the firearm is there and the general intent to possess it." ' *Fobb*, 91 So.3d at 1244 (quoting *State v. McKinney*, 44,269, p. 7 (La.App. 2 Cir. 5/13/09), 12 So.3d 422, 426). " '[M]ere presence of a defendant in the area of the contraband or other evidence seized alone does not prove that he exercised dominion and control over the evidence and therefore had it in his constructive possession.' " *State v. Johnson*, 03-1228, p. 6 (La. 4/14/04), 870 So.2d 995, 998-1000 (quoting *State v. Walker*, 369 So.2d 1345, 1346 (La.1979) ).

The supreme court has broadly interpreted constructive possession. In *Johnson*, a handgun was found on the floorboard of a vehicle where Johnson's feet had been before he was removed from the car. Testimony revealed that no one saw Johnson with the gun and the vehicle did not belong to Johnson. Additionally, another occupant of the vehicle claimed ownership of the gun and testified that she attempted to hide the gun before exiting the vehicle. The supreme court reversed the appellate court's decision to overturn Johnson's conviction for possession of a firearm by a convicted felon, stating:

> The evidence presented by the State was sufficient to prove that the defendant was *in fact* in possession of the weapon and that this possession was enough to sustain a conviction on the charge of a felon in possession of a firearm, La. R.S. 14:95.1. . . . In this matter, the jury made a credibility determination and found [two witnesses'] accounts unconvincing. Consequently, it was inappropriate for the court of appeal to impinge on the fact finder's discretion to rely instead on the testimony of [a third witness] absent a showing that the defendant was not granted the fundamental due process of law.

*Johnson*, 870 So.2d at 998-1000 (citations omitted) (emphasis in original). General intent "is a fact question which 'may be inferred from the circumstances of a transaction.' " *Edwards*, 107 So.3d at 888 (quoting *State v. Johnson*, 09-862, (La.App. 3 Cir. 2/3/10), 28 So.3d 1263, 1267).

*State v. Obrien*, 17-922, pp. 12-13 (La.App. 3 Cir. 4/4/18), 242 So.3d 1254, 1264-65

(alterations in original), *writ denied*, 18-663 (La. 2/18/19), 265 So.3d 769.

At trial, there was a joint stipulation that Defendant had been convicted of

possession of methamphetamine, a felony, on April 4, 2014; he was sentenced to

serve four years at hard labor; he was released on parole on November 24, 2015; and his parole was completed on February 22, 2019.

Deputy Dewayne Rice ("Deputy Rice") was the State's first witness. He was employed by the Natchitoches Parish Sheriff's Office on February 17, 2020. At approximately 2:00 a.m., Deputy Rice, along with Deputy James Creighton ("Deputy Creighton"), was patrolling in Campti.[1] Deputy Rice testified he was patrolling:

> looking for anything out of the ordinary, especially around that time of night . . . 2, 3, 4, 5 in the morning . . . what time people usually sleep. No one should be roaming the roads that time of night. So, we drive around in neighborhoods and look for suspicious activity.

Deputies Rice and Creighton were across the street from city hall talking at approximately 2:35 a.m. At that time, a silver Buick passed them. The vehicle caught Deputy Rice's attention, and it immediately made a left turn without using a signal. When asked how many cars he saw within ten minutes before and after he stopped the Buick, Deputy Rice replied: "[L]ike I said it was 2:30 in the morning, there shouldn't be any . . . or there w[ere]n't any cars on the road that night. And he was one of the only few cars that passed us." Deputy Rice further testified:

A. [H]e tried to make a left turn or he did make a left turn or he did make a left now, I'm unsure if he used his signal or not, but it wasn't illuminated when he did make that left.

Q. There was no turn signal visible to you?

A. No, Sir.

Q. If it had been working, would you have seen it?

A. Yes, Sir, I would have.

. . . .

Q. Okay. And your interest was piqued because of the circumstances surrounding this?

---

[1] Deputy Rice described Campti as a high crime area.

5

A.     Yes, Sir, it was 2 o'clock in the morning. And he drove by and made an immediate left right after seeing me and Deputy Creighton parked at the hotel.

Deputy Rice exited his unit when the Buick stopped and asked the driver to move to the front of the patrol unit. He recognized the driver as Leander Robinson. Robinson was asked if he had any drugs or weapons in the vehicle, which was registered to him, and said he did not. Thereafter, Deputy Rice asked Robinson for permission to search the vehicle, which Robinson gave.

Deputy Rice testified that Deputy Creighton was standing at the front of Deputy Rice's unit, noticed there was a person in the front passenger seat of the Buick moving around, and approached the vehicle. Deputy Rice could not see what the passenger was doing but saw his head moving from side to side. Deputy Creighton removed the passenger and brought him to the front of Deputy Rice's unit. Deputy Creighton then searched the Buick. Deputy Creighton discovered a weapon under the seat. The weapon, a revolver, was removed from a Beats headphone case, which did not contain any headphones. Deputy Rice testified, "Deputy Creighton left the vehicle with the weapon in his hand from the passenger seat of the vehicle." Deputy Rice identified Defendant as the passenger.

According to Deputy Rice, both Robinson and Defendant were advised of their *Miranda* rights "at this point." Defendant nodded when asked if he understood those rights. Thereafter, Deputy Rice asked Robinson again if the gun was his, and Robinson said no. Robinson "said he didn't know whose it was or if it was in there at all." Deputy Rice testified about asking Defendant as follows:

A.     . . . Mr. Bonier had already been placed into handcuffs due to his proximity. Uh, both Bonier and Leander were placed in handcuffs, let me, uh . . . correct. Uh, they are both placed in handcuffs, and uh, during the investigation we came to the conclusion that the weapon may have belonged to Mr. Bonier. So, we asked him, who did[] or I asked at first, did the weapon

6

belong to you. He did not say anything. Well . . . Deputy Creighton asked him again, who did the weapon belong to? And he said, I guess me.

Q. I guess me?

A. Yes Sir.

Q. In the way that was said, in the context that it was said, in the tone of voice, in the moment . . . what did you think?

A. Uh, he was upset. But he was admitting to the weapon being his.

Q. Okay. Uh, he . . . uh, you were convinced that it was his?

A. Yes Sir, I was.

Q. And he just told you it was his?

A. Yes Sir, he did.

Q. Okay, Mr. Robinson, never told you was [sic] his?

A. No Sir, he did not claim the weapon to be his.

Q. Mr. Robinson, who gave you permission to search the vehicle, correct?

A. Yes, Sir, he did.

. . . .

Q. Would it be fair to say that you formed an opinion?

A. Yes, I did.

Q. And uh . . . is that opinion partly based on the fact that Mr. Robinson gave you permission to search the vehicle?

A. Yes Sir, and with Mr. Bonier being in close proximity of that weapon.

Deputy Rice thought Defendant's remark was an admission.

Deputy Rice thought his body camera was recording the entire traffic stop. However, it did not due to user error. The portion of the stop that was recorded was admitted as State's Exhibit 5 and was played for the jury.

The video opens with Defendant, who is handcuffed, sitting in the back of a police car. When asked, Defendant admitted he was a convicted felon. An officer walks to the passenger side of the Buick. He shines the flashlight into the vehicle, and another officer checks the driver's side of the vehicle. There is a discussion between the officers about the glovebox. One of the officers discusses the glovebox over the radio with his lieutenant. The officer asked the lieutenant if he could search the glove compartment if he got consent to search a vehicle, a weapon was found in the vehicle, and it was believed that the person that was sitting on it was a convicted felon. The officer was told he had probable cause to search the entire vehicle. The officer then began to search the vehicle. Robinson was subsequently *Mirandized*. The officer then *Mirandized* Defendant. In a discussion regarding possession of the gun, Officer Creighton indicated "He took claim for it . . . ."

When asked what they were searching for, Deputy Rice testified they were looking for anything related to the crime. Deputy Rice then stated, "well, [Bonier] lied to us about the weapon. So, we assumed that he lied about drugs." Deputy Rice was further questioned:

Q.   All right, well I thought he said I guess it's . . . oh, the first time?

A.   The first time. That's why Deputy Creighton was upset when he came back to the vehicle.

Q.   All right. So, but you had consent from Mr. Robinson?

A.   Yes, Sir.

According to Deputy Rice, Defendant's statement regarding the gun was not recorded. Deputy Rice's report indicated Defendant said, "I guess me."

No DNA or fingerprint testing was done due to where the gun was located and Defendant's admission. Deputy Rice said Robinson could have reached the gun from his location. However, it would not make any sense for a driver to keep a gun

under the passenger seat. He never saw Robinson move toward the passenger side of the vehicle.

Deputy Creighton agreed that seeing a car at 2:35 in the morning piqued his curiosity. He testified that immediately after passing the officers, the vehicle made a left turn, and the driver did not use a signal. Deputy Rice approached the driver, and Deputy Creighton went to the passenger side of the vehicle. When the dome light came on when Robinson exited the vehicle, Deputy Creighton saw someone in the passenger seat, and there was movement in the car. Deputy Creighton approached the panel between the back and front passenger doors. At that time, the passenger had his hands in his pants, so Deputy Creighton immediately asked him to remove his hands. Deputy Creighton further testified:

A.    . . . I can actually see the passenger in the vehicle . . . kind of hunched over and he had his hands down lower. So, I was more inept (phonetic) to trying to get to the vehicle and approach as best I could to make sure that it wasn't, you know, anything to alarm anybody.

Q.    So, was he hunched over like . . . .

A.    I would say more . . . I can't really move this chair, to be completely honest with you. Uh, but I mean, he was leaned over. And when I had approached the vehicle, I had seen the hands kind of searching the area. But, I mean, he was leaned over.

Q.    So, you don't know where his hands were when he was first leaning over, do you?

A.    No, Sir. I couldn't see from where I was at.

According to Deputy Creighton, Robinson told Deputy Rice he could search the vehicle. Thereafter, Defendant was asked to get out of the vehicle, and a pat down was done. Robinson then advised Deputy Rice there was nothing in his vehicle and that it could be searched. Deputy Creighton then had Defendant stand by Deputy Rice's unit. Deputy Creighton testified:

At that point, I had walked back to the passenger side. And as soon as I had looked back into the car, I could see what was consistent to a handle of a firearm sticking out of a Beats headphone case. At that point, I turned to Deputy Rice. I advised Deputy Rice to place both subjects . . . when I could see that it was a handgun, to place both subjects . . . or just detain both subjects until we could clarify who's [sic] weapon it belonged to. Because at this point, (inaudible) told us there was nothing in the vehicle. Both subjects were detained. I believe I went to my unit to put gloves on . . . and I may not have put gloves on, I don't remember. I went back to the unit or to the vehicle and I retrieved the firearm out of the car.

Deputy Creighton further testified that Defendant and Robinson had both advised there were no weapons in the vehicle. When Deputy Creighton saw the gun, he turned back "and asked . . . are you fucking kidding me that there is a firearm under the seat of the car, where you was [sic] just sitting and moving your hands around?" He indicated he was caught off guard. He said:

There was enough from the dome lights being on and after I had removed Mr. Bonier from the vehicle, the handle was protruding enough out from underneath the seat where the Beats headphone case was, that I could actually see the figure of the actual handle. I believe, underneath, the floorboards even had like where the glovebox is . . . I think when you opened the door a light comes on, on the right side of the door panel. And that's actually what illuminated and really caught my attention of it.

Deputy Creighton then testified that the handle was "completely sticking out from underneath the seat." The two men were handcuffed after the gun was found and *Mirandized*.

Deputy Creighton testified that when Deputy Rice asked who the firearm belonged to, Defendant said, "I guess it's mine." Deputy Creighton thought this meant it was Defendant's gun. Thereafter, Defendant was arrested. Robinson was not arrested due to Defendant's remark and Robinson's claim that he had did not own or possess a firearm.

On cross-examination, Deputy Creighton was questioned about Robinson's claim that Deputy Creighton asked Defendant whose gun it was when Deputy

10

Creighton and Defendant were on the side of Robinson's car. Deputy Creighton testified this was not accurate. Deputy Creighton said the first time he heard the statement was when Defendant was in the back of the patrol car. Failure to turn on his bodycam was a mistake.

On redirect, Deputy Creighton agreed that a gun on the passenger side would not help the driver protect himself, and he did not normally find a person possessing a gun store it on the other side of the vehicle.

Leander Robinson had previously been convicted of distribution of methamphetamine, had outstanding charges at that time of trial, and was participating in drug court. He went by the home of Defendant, who was his nephew, on February 17, 2020. Defendant lived fifty yards from him. While Robinson was at Defendant's, Defendant got a call and asked Robinson to drive him to Clarence, which was approximately five miles away. Defendant stayed at a residence in Clarence for ten to fifteen minutes. Robinson then drove Defendant back to Campti.

When discussing the traffic stop, Robinson testified that he used his turn signal, but police said he did not. He thought the light was working. However, the front signal was "messed up" when he bought the car. Defendant was asleep, but Robinson woke him when the police turned their lights on.

An officer approached Robinson's door and asked him to step out. Robinson was told he was stopped because he did not use a turn signal. He was then asked if he had any drugs or weapons and said no. Robinson testified he was not asked for consent to search the vehicle. However, he would have given consent if he had been asked. Robinson testified that he did not have anything in his car to hide, including guns or drugs. He further indicated that police did not search the glovebox. On redirect, Robinson indicated, "I didn't tell them to search my car." He was then asked if police asked for permission to search and replied, "Uh, yeah, they ask

11

permission." He was then asked if he told police it was okay and if he remembered. Robinson responded, "No Sir, I don't remember."

Robinson testified the gun was found on the passenger side under the seat, it was not his gun, and he had not seen the gun before. Robinson told police he did not have a weapon in the car. He testified that police asked Defendant if the gun was his, and Defendant said, "yeah." Robinson indicated he did not own headphones and had not seen the Beats headphones' bag before. Robinson did not see Defendant with anything when he got into Robinson's car.

Robinson was questioned regarding where the officers and Defendant were when Defendant said the gun was his. However, Robinson said, "I don't really uh . . . I can't call it." Robinson then said Defendant was standing outside Robinson's car speaking to the white officer, and Robinson was standing with the black officer fifteen to twenty feet away.

Lieutenant Jonathan Roberts ("Lieutenant Roberts") was questioned about a call made by Defendant two hours after he was booked. He testified that prior to every call there was a prompt that alerted the caller that the conversation was being monitored and recorded. Calls made by Defendant were admitted as State's Exhibit 6. There was a call on the date Defendant was arrested, February 17, 2020, at 4:32 a.m. The recording was transcribed, and the transcript admitted as State's Exhibit 7.

During that call, Defendant stated the following:

Brian: Baby it[']s like this. I had gun on, on my side and you know[.]

. . . .

Brian: You know, I said it was mine, it wasn't no use for . . . [.]

. . . .

Brian: Well, everything good, you can't . . . you don't understand. That gun ain't hot or nothing like that.

. . . .

> [Unidentified Female]: Motherfucker Brian you don't need that shit. That shit cause nothing but trouble. Leave that shit alone. Fuck I ain't got nam [sic] and God protect me every day.

> Brian: You ain't here.

> [Unidentified Female]: And I'm in a big city on this road every morning by myself.

Lieutenant Roberts testified that the reference to hot indicated whether the gun was stolen or not, and Defendant's statement indicated the gun was not stolen. Lieutenant Roberts was asked if the statement regarding the gun not being hot could simply indicate Defendant was not being "charged with a stolen weapon," and Lieutenant Roberts indicated it could. Lieutenant Roberts interpreted the unidentified female's words as indicating Defendant did not need a gun, and she did not need a gun. Lieutenant Roberts concluded the statement that Defendant had a gun on his side indicated the gun was Defendant's. Lieutenant Roberts suggested Defendant should not know whether the gun was hot or not if the gun was not Defendant's.

Defendant argues the State did not prove he actually possessed the firearm inasmuch as Robinson testified that he never saw Defendant with a gun or anything that looked like a gun. Deputy Creighton believed Defendant leaned toward where the gun was located but never saw Defendant touch or possess the gun, and DNA and fingerprint testing was not requested. Therefore, the State had to rely on circumstantial evidence to convict Defendant. Defendant asserts the evidence was insufficient to prove he knowingly and constructively possessed the gun because he was able to see it when he entered the vehicle. Defendant suggests his statement "I guess mine" or "I guess me" is not sufficient because it is not a confession but only circumstantial evidence. However, his statement was not recorded by the officers,

13

who both claimed they did not know how to properly operate their body cameras and was not sufficient alone to prove the State's case. Defendant next argues his jail conversation in which he "simply acknowledged that the gun was found on his side of the vehicle, and he told the cops it was his gun" did not prove he possessed the gun. Despite the State's repeated attempts to show the gun did not belong to Robinson, the gun was in the immediate control of Robinson and was accessible.

In support of upholding the conviction, the State points out Defendant's statement at the scene; Robinson's testimony that Defendant claimed ownership of the gun; and Defendant's statements during the jail call, including, "I know I said it was mine . . . ," and "[t]hat gun ain't hot or nothing like that."

The evidence presented indicates the gun was found under the seat in which Defendant was sitting. Prior to his removal from the vehicle, Defendant was seen leaning over and moving around. When asked who the gun belonged to, he stated either "I guess me" or "It's mine." Robinson denied having ever seen the gun and confirmed Defendant told police the gun was Defendant's. Moreover, Defendant, in his jail call, said he told police the gun was his and the gun was not hot.

In *Johnson*, 870 So.2d 995, which this court discussed in *Obrien*, 242 So.3d 1254, the supreme court was called upon to address the sufficiency of the evidence to support the defendant's conviction for possession of a firearm by a convicted felon. Testimony revealed the following:

> Officer Wayne Chandler approached the automobile and noticed the strong smell of marijuana and that the driver appeared to be intoxicated. The officers placed their spotlights on the car, and throughout their investigation and search did not observe any furtive movements by any of the occupants of the car. Because Officer Chandler recognized the defendant, a passenger in the backseat of the vehicle, from past narcotics arrests, he focused his flashlight on him to see if he attempted to dispose of narcotics while everyone else was removed from the car. When the defendant finally exited the vehicle, Officer Chandler looked inside it and found a small, .25 caliber automatic pistol on the floorboard of the car where the defendant's feet had been. None of the

14

occupants of the vehicle responded when Officer Chandler asked to whom the gun belonged.

During the trial, Officer Chandler testified that he did not see the defendant make any type of furtive movements[,] but the officer felt that the defendant "appeared nervous and [was] hiding something." As the others were exiting the vehicle, the officers testified that the defendant "was reluctant to leave, and repeatedly asked 'why do I have to get out?' "

Officer Tim Morris testified at trial that he was assisting in removing and searching the occupants of the vehicle and noted that the defendant was the last person to exit the vehicle. Officer Morris did not recall seeing any objects being passed between any of the passengers and he testified that he did not observe the defendant making any furtive movements.

Sergeant Marvin Garrett also testified that the defendant was the last person to be removed from the vehicle and that it appeared that the defendant was reluctant to exit the vehicle. Sergeant Garrett also testified that he did not observe the defendant making any furtive movements and that none of the vehicle's passengers admitted owning the pistol.

The State's first adverse witness at trial, Monica Eason, testified that she was in the car, sitting in the middle of the backseat next to the defendant, on the night in question. She stated that they had just picked up the defendant to give him a ride home when they were stopped by the police. She further testified that the pistol belonged to her and that she had found it near a trash dumpster three months before the night of the incident. Eason testified that she had been carrying the pistol in her purse, but as she "scoot[ed] across the backseat to get out of the car, [she] took the gun out of [her] purse, and attempted to push it up under the driver's seat." She also testified that the officer removed the defendant from the car first and placed him in a patrol car. Further, she admitted that she remained silent when the officer asked to whom the gun belonged and it was not until six days after the defendant's arrest that she went to the police station to make a written statement that the pistol was hers and not the defendant's. During the State's questioning, Eason stated that she did not know how the pistol worked nor did she know where the safety was located.

Tinyia Reeder was also called by the State as an adverse witness at trial. She testified that she was also seated in the backseat of the vehicle with the defendant on the night of his arrest. She testified that as the police removed the defendant from the car, Eason whispered to her that she had a gun, and that Eason put the gun under the seat. Reeder also stated that she never saw the gun herself and was unable to recall which seat she was sitting in, but later testified that she was sitting on the right of the backseat.

15

The defendant testified that on June 29, 2000, he never saw or possessed the .25 caliber pistol found in the vehicle. He stated that his friends, Eason and Reeder, stopped to give him a ride and just moments later the car was stopped by the police. The defendant stated he was sitting in the backseat with Eason and Reeder, but that he did not see either of them with the pistol.

*Johnson*, 870 So.2d at 996-97 (alterations in original). The supreme court found the evidence was sufficient to prove the defendant was in possession of the weapon, citing the following testimony from Officer Chandler:

A. We found a small .25 caliber pistol laying where his feet were . . . [.] He appeared to be hiding something from us. He refused to make eye contact. We had to ask him several times to get out of the vehicle. It was like he was scared to get out. We assumed there was narcotics in the vehicle, is what we were looking for . . . [.] He kept asking "why do I got to get out? Why do I have to get out of the car?"

Q. And the gun-the gun was located then right where his feet were? It [sic] that correct?

A. Yes, sir.

Q. So . . . is it obvious to you then that if the gun was there his feet were either on it hiding it from your light or . . . right located underneath his feet?

A. Yes, sir.

*Id.* at 999. The supreme court further noted "it was inappropriate for the court of appeal to impinge on the fact finder's discretion to rely . . . on the testimony of Officer Chandler[.]" *Id.* at 1000.

In *State v. Washington*, 605 So.2d 720 (La.App. 2 Cir. 1992), *writ denied*, 610 So.2d 817 (La.1993), the defendant was a passenger in a vehicle the police stopped because they suspected it had been used in the commission of a crime. The defendant provided a false name, and a firearm was found in plain view on the floorboard of the passenger side. The defendant argued he did not own the vehicle, was not driving the vehicle, and the gun was not traced to him. The second circuit noted the defendant would likely have had his foot touching the weapon, particularly

in light of the driver's testimony that he had not stopped the car so suddenly as to cause the gun to come into view from underneath the seat. Based on these circumstances, the court found the defendant had constructive possession of the weapon.

In *State v. Brokenberry*, 41,481 (La.App. 2 Cir. 11/3/06), 942 So.2d 1209, police stopped a vehicle driven by the defendant and occupied by three passengers. Upon being questioned, the defendant admitted there were weapons inside the vehicle. Inside the vehicle, police found a MAC 90 rifle, with its barrel propped between the front seats and the stock on the backseat floorboard. They also found a Glock 40 handgun on the front passenger floorboard. Police testified that both weapons were within the defendant's reach. The defendant informed police that he did not own the weapons, and they had been purchased by his brother and father. The defendant admitted he knew the weapons were in the vehicle. When confronted with the fact that he was near the weapons, the defendant stated: "'Man, these streets are dangerous; you can't blame me for carrying these.'" *Id.* at 1211. At trial, one of the passengers testified that the weapons were inside the vehicle because he was moving them from his grandmother's home to his father's home. The passenger also testified the weapons were on the backseat floorboard, beyond the defendant's reach, and must have shifted during the stop. The defendant testified he knew the passenger entered the vehicle with the weapons but denied telling police the streets were dangerous. Thus, he could not be blamed for carrying weapons. The defendant also denied having possession of or easy access to the weapons.

The second circuit found the evidence was sufficient to establish the defendant had constructive possession of the weapons and intended to possess the weapons so as to support his conviction for possession of a firearm by a convicted felon. The second circuit further found the weapons remained subject to the defendant's

17

dominion and control by virtue of his knowledge that the weapons were in vehicle as well as the proximity of the weapons to the defendant at time of the stop.

In light of the testimony presented and cases cited herein, we find the evidence was sufficient to prove Defendant's guilty knowledge and constructive possession of the firearm beyond a reasonable doubt. Accordingly, we affirm Defendant's conviction.

## *Motion for Mistrial*

In his second assignment of error, Defendant contends the trial court abused its discretion in denying the motion for mistrial made during opening statements. Defendant suggests the court's ruling that the State was allowed to tell the jury about inculpatory statements allegedly made by him because they were res gestae is legally incorrect. Because the inculpatory statements had not been deemed admissible prior to opening statements, a mistrial should have been granted.

Louisiana Code of Criminal Procedure Article 767 provides: "The state shall not, in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant unless the statement has been previously ruled admissible in the case."

"[M]istrial is such a drastic remedy, unless mandated by [La.Code Crim.P.] article 770, it should only be used in those situations which might result in substantial prejudice to the defendant." *State v. Thomas*, 17-526, p. 13 (La.App. 3 Cir. 12/13/17), 258 So.3d 708, 716 (quoting *State v. Burdgess*, 434 So.2d 1062, 1065 (La.1983)). Louisiana Code of Criminal Procedure Article 770 states, in part:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;

(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

(3) The failure of the defendant to testify in his own defense; or

(4) The refusal of the judge to direct a verdict.

In its opening statement, the State made the following remarks:

During the investigation, they asked Mr. Robinson . . . is this your gun? No, man . . . I've got felonies, not my gun. It was not on his side. It was on the other side. So, they go to Mr. Bonier. Is this your gun? No, it's not my gun. Come on, whose gun is it? And then Mr. Bonier says . . . I guess it's me.

Defense counsel objected because there had not been a hearing to determine the admissibility of Defendant's inculpatory statement prior to trial. He then moved for a mistrial. The State argued the response was res gestae, noted no motion to suppress had been filed, and asserted it was under the impression there was no objection to the use of Defendant's statement. It was noted by the State and acknowledged by defense counsel that Defendant's statement was in the police report that had been provided during open file discovery. The court recessed to consider the issue, subsequently denying the request for mistrial, and finding:

The statement is part of the res gestae, it happened under the immediate pressure of the events. There was no Motion to Suppress that was filed. And the Court is citing both State of Louisiana versus William Barnes, which is a Supreme Court case 414 So.2d 711 and State of Louisiana versus Walker.

Thereafter, the State continued its opening statement:

Based on that investigation, he was placed under arrest for convicted felon of possession of a firearm. Having just gotten off of parole. Having this loaded .38 caliber weapon at his feet in full view. However, that's not all we have ladies and gentlemen. You will hear a jail telephone, between the defendant and his wife, right after he's arrested. And about . . . [.]

MR. BOKENFOR: And just . . . [.] Same objection as I noted earlier, Your Honor, for the record.

THE COURT: Overruled.

Defendant contends that neither *State v. Barnes*, 414 So.2d 711 (La.1982), nor *State v. Walker*, 94-587 (La.App. 1 Cir. 4/7/95), 654 So.2d 451, *writs denied*, 95-1124, 95-1125 (La. 9/22/95), 660 So.2d 470, dealt with opening statements but did address res gestae and the admissibility of evidence in the state's case in chief. Moreover, they both were controlled by La.Code Crim.P. art. 768. Defendant argues that his statement to police and the jail call were not res gestae. Defendant suggests the remark he made to police was the result of interrogation, and the jail call occurred after he was arrested and transported to jail.

At issue in *Barnes*, 414 So.2d at 713, was testimony by a state witness that immediately after the shooting he heard Junior Bazile tell the defendant, "'You done shot the son-of-a-bitch.'" The defendant objected to the testimony on the basis of hearsay and lack of notice. The supreme court concluded Bazile's "spontaneous declaration made in conjunction with the killing" was res gestae. *Id.* at 714. Additionally, "[n]otice under La.C.Cr.P. Art. 768 is not required when the statement sought to be introduced forms a part of the res gestae." *Barnes*, 414 So.2d at 714 (footnote omitted). Louisiana Code of Criminal Procedure Article 768 provides that if the state intends to introduce a confession or inculpatory statement into evidence, it must disclose the statement in pretrial discovery or else advise the defendant in writing prior to the opening statement that the confession is to be used.

The trial court did not provide a citation to the *Walker* case it relied on. In the case cited by Defendant, the defense argued the testimony of Frank Washington, an undercover deputy, repeating defendant's statement, "'Well I know you're cool, because you dealt with my brother,'" should have been stricken because the state

20

failed to provide the defense with notice of its intent to introduce the statement. 654 So.2d at 453. The court rejected the assignment of error due to lack of a contemporaneous objection to the testimony. *Id.*

The State notes open file discovery was provided to Defendant. Thus, he was aware of the information contained in the police report and of the jail call. Moreover, Defendant suffered no prejudice inasmuch as the statement contained in the police report was admitted into evidence without objection. In support of this contention, the State cites *State v. Benoit*, 17-187 (La.App. 5 Cir. 12/29/17), 237 So.3d 1214. As for the jail call, the State asserts the statements made during the call were voluntary, spontaneous, and made without any expectation of privacy.

In *Benoit*, 237 So.3d 1214, the defendant moved for a mistrial after the state, in its opening statement, referenced the defendant's statements to police that he was a sex addict, that he thought the victim was telling the truth, and it was possible he committed the offense when he was drinking. Following these remarks, the defendant moved for a mistrial pursuant to La.Code Crim.P. art. 767. He argued there was no ruling as to the admissibility of the statements, and the notices filed in court did not give the state authority to reference the statements during its opening statement. The trial court denied the motion for mistrial, reasoning defense counsel had notice and was not taken by surprise or prejudiced in preparing a defense. The fifth circuit addressed the trial court's denial of the motion for mistrial as follows:

> In State v. Lisotta, 97-407 (La. App. 5 Cir. 02/25/98), 712 So.2d 525, 527 the State in its opening statement said:
>
> > You're also going to hear from Deputy Kuhn that this defendant made several statements at the time that he was arrested denying certain things, saying things that the State intends to show, prove, that he's guilty, exactly what we say he's guilty of.
>
> In Lisotta, defendant moved for a mistrial pursuant to La. C.Cr.P. art. 767 because any statements allegedly made by the deputy had not yet

been deemed admissible. This Court found that the record showed that prior to trial, the State had filed a notice of its intent to use and introduce defendant's statements into evidence. This Court reasoned that the purpose of La. C.Cr.P. art. 767 is to prevent surprise and prejudice. Finding State v. Strickland, 683 So.2d 218 (La. 1996) controlling, this Court found that because the deputy's statement was admitted during trial, the State's premature mention of the statement in its opening statement to the jury caused no prejudice. See also, State v. Roberts, 06-765 (La. App. 3 Cir. 01/17/07), 947 So.2d 208, 230; State v. Whitmore, 353 So.2d 1286, 1288-1289 (La. 1977).

Similarly, in this case, the record shows that the State filed a notice of its intent to use defendant's statements during opening statement and to introduce them into evidence and that defendant's statements were subsequently admitted into evidence at trial. We find that the State's premature mention of defendant's statements in the State's opening statement caused no real prejudice to defendant because the statements were later determined admissible at trial. Accordingly, the trial court did not abuse its discretion in denying the motion for a mistrial.

*Id.* at 1221-22 (footnote omitted).

This court discussed *Benoit*, 237 So.3d 1214, in *State v. Alexander*, 17-1166, pp. 27-28 (La.App. 3 Cir. 9/26/18), 256 So.3d 365, 382, *writ denied*, 18-1794 (La. 4/15/19), 267 So.3d 1130, and subsequently stated:

In *State v. Strickland*, 94-25 (La. 11/1/96), 683 So.2d 218, *superseded by statue on other grounds*, La.Code Crim.P. art. 801, 2001 La. Acts No. 310 § 1, . . . the defendant argued the trial court erred in failing to declare a mistrial after the state referred to an alleged inculpatory statement during its opening statement. The issue was addressed by the supreme court as follows:

The record reflects that during his opening argument, the prosecutor stated:

You will hear [Atkin's] testimony as to when these two men entered the trailer as to what Lawson Strickland told them he had just done.

Vol. 4, p. 849. Defense counsel moved for a mistrial at a bench conference. The trial judge allowed the prosecutor to finish his opening statement and ultimately decided to deny the motion, finding the statement was part of the *res gestae* of the offense.

At the time of trial, La.C.Cr.P. art. 767 provided:

> The state shall not, in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant.

> La.Acts 1995, No. 1278 amended the statute by adding "unless the statement has been previously ruled admissible." Even at the time of trial, however, a violation of the rule did not automatically require a mistrial. The purpose of the rule is to "prevent surprise and to allow adequate time for preparation of the defense, as well as to avoid certain problems that had been attendant to mentioning of confessions or inculpatory statements in the state's opening statement." *State v. Parker*, 436 So.2d 495, 499 (La.1983); *State v. Russell*, 416 So.2d 1283, 1288 (La.1982), *cert. denied*, 459 U.S. 974, 103 S.Ct. 309, 74 L.Ed.2d 288 (1982).

> In cases where the defendant knows through discovery of the state's intention to introduce the statement and the statement is later properly admitted, the prosecution's premature mention of the statement in its opening statement causes no prejudice to the defendant. *State v. Whitmore*, 353 So.2d 1286, 1289 (La.1977). Here, the defendant had pre-trial notice of the state's intention to introduce the statements. The trial judge properly admitted the testimony during trial. Thus, the defendant suffered no prejudice from the state's premature mention of his inculpatory statements in its opening statement. The trial judge did not err in denying the defense motion for mistrial.

*Id.* at 232-33 (alteration in original).

In *Alexander*, 256 So.3d 365, this court did not determine whether the defendant's remarks were an admission, confession, or inculpatory statement but addressed whether the defendant was prejudiced by the state's actions. It found the defendant did not suffer prejudice as a result of the state's premature reference to the defendant's statement to 911 in its opening statement inasmuch as the defendant received pre-trial notice of the state's intent to use the statement and failed to object when the testimony regarding the statement was presented. This court noted that defense counsel explicitly stated he was not arguing the statement should be

suppressed or complaining about notice of the state's intent to use the statement. *Id*. at 379.

We need not determine whether the trial court properly classified the remark by Defendant to the deputy as res gestae. The police report was provided to Defendant in discovery. Moreover, there was no objection to the admissibility of testimony regarding Defendant's remark to police. Based on *Benoit*, 237 So.3d 1214, and *Alexander*, 256 So.3d 365, we find Defendant did not suffer any prejudice as a result of the State's premature reference to Defendant's remark.

Defendant objected to the State's reference to his jail call. However, defense counsel did not move for a mistrial at that time, and there was no finding by the trial court that the jail call constituted res gestae. For these reasons, we find this assignment of error lacks merit.

*Ineffective Assistance of Counsel*

In his third assignment of error, Defendant contends trial counsel provided ineffective assistance of counsel for failing to file motions to suppress the gun and alleged statement by Defendant. Furthermore, counsel's failure to contemporaneously object to the admission of this evidence compounded the ineffective representation.

Defendant first addresses suppression of the traffic stop. He argues that counsel should have pitted the State's key witnesses against each other inasmuch as their testimony was contradictory. Defendant asserts Robinson testified that his back turn signal worked, and he used it on the night in question. Whereas deputies testified Robinson did not use his signal, they viewed anyone driving at 2:30 a.m. suspicions, and there was no dashcam footage. Defendant suggests that had the stop

been deemed illegal, the gun and his statement to police would have been suppressed.

Defendant next addresses suppression of the search of Robinson's vehicle. Defendant suggests that even if the stop was proper, the legality of the search was in dispute. Defendant acknowledges that a search of the vehicle may have been permitted if Deputy Creighton saw the gun in plain view and knew one of the occupants was a convicted felon. However, Deputy Creighton's testimony that he first saw the gun when he conducted the search controverted the State's argument that the gun was in plain view when Defendant exited the vehicle. According to Defendant, Deputy Creighton testified that he first realized there was a gun under the seat when he performed the search, which he claimed was done based on Robinson's consent. However, Robinson testified he did not consent to the search. Thus, the search of the car, which led to the recovery of the gun and subsequent statement from Defendant, should have been suppressed.

Defendant finally addresses the suppression of his statement "I guess me." Defendant suggests his statement was made prior to him being *Mirandized*, and the remark was the result of questions asked to elicit inculpatory statements while he was detained in handcuffs. Defendant suggests that inasmuch as no one saw him with the gun, the gun was found under the seat of a vehicle belonging to another, and there was no forensic evidence linking him to the gun, the evidence would not have been sufficient to convict him but for his statement to police.

The State suggests the record is insufficient to review this assignment of error, and the claims should be considered at a post-conviction hearing.

> A claim of ineffective assistance of counsel is properly raised in an application for post-conviction relief. This allows the trial judge an opportunity to order a full evidentiary hearing on the matter. *State v. Burkhalter*, 428 So.2d 449 (La.1983). However, where the record contains evidence sufficient to decide the issue and the issue is raised

by an assignment of error on appeal, it may be considered. *State v. James*, 95-962 (La.App. 3 Cir. 2/14/96); 670 So.2d 461.

*State v. Francis*, 99-208, pp. 10-11 (La.App. 3 Cir. 10/6/99), 748 So.2d 484, 491, *writ denied*, 00-544 (La. 11/13/00), 773 So.2d 156.

There are cases in which courts of appeal have reviewed claims of ineffective assistance of counsel for failure to file a motion to suppress. For example, in *State (City of Ruston) v. Campos*, 51,447, 51-448, p. 15 (La.App. 2 Cir. 6/21/17), 224 So.3d 480, 491, the second circuit concluded:

> [T]he testimony of Officer Castaneda makes clear that the traffic stop was valid, and the subsequent arrest for DWI, the recording of the stop, and the field sobriety tests were also valid. Additionally, as stated earlier, Campos was advised of his rights early on and voluntarily submitted to the Breathalyzer test. There was no basis for the motion to suppress and no likelihood that it would have resulted in the exclusion of evidence.

However, there are situations wherein consideration of the issue is not appropriate. In *State v. Montejo*, 06-1807, pp. 22-26 (La. 5/11/10), 40 So.3d 952, 968-70 (alterations in original) (footnotes omitted), *cert. denied*, 562 U.S. 1082, 131 S.Ct. 656 (2010), which was on remand from the Supreme Court for consideration of whether an apology letter should be suppressed pursuant to *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880 (1981) (under which a defendant in custody cannot be interrogated once he has asserted his right to counsel unless he initiates further communications with police), the supreme court stated the following:

> We have previously considered the problems arising when a party does not file a motion to suppress, and then later testifies at trial as to facts that suggest the evidence should have been suppressed. *State v. Lipscomb*, 00-2836 (La.1/25/02), 807 So.2d 218 and *State v. Watson*, 00-1580 (La.5/14/02), 817 So.2d 81. In *Lipscomb*, the defendant alleged on appeal that his attorney at trial provided ineffective assistance of counsel by failing to file a motion to suppress evidence. This Court found ineffective assistance claims are to be considered in post-conviction proceedings and not on appeal, and, in so holding, explained the reasons why motions to suppress are required pre-trial:

> [T]he constitutional validity of a seizure is ordinarily a matter for the court to determine in the context of a pre-trial motion to suppress if counsel elects to file one. La.C.Cr.P. art. 703. This requirement insures that "all disputes over police conduct unrelated to the guilt or innocence of the accused are eliminated from the jury trial' and thereby avoids unwarranted delay and jury confusion." *State v. Christian*, 26,589 (La.App. 2 Cir. 1/25/95), 649 So.2d 806, 808, *writ denied*, 95-0791 (La.9/15/95), 660 So.2d 448.

807 So.2d at 219-20. The Court recognized that "with the constitutional validity of the search not at issue, neither the state nor the defense had any particular need to delve in detail into the circumstances surrounding [the officer's] seizure of the evidence." *Id.* at 221. In the similar case of *State v. Watson*, *supra*, a police officer testified at trial explaining the circumstances which led to the seizure of drugs and defendant's arrest. The defendant then testified, in contrast to the officer's testimony, that the officers pulled him off his bike, questioned him and beat him before arresting him. The appellate court properly found the defendant was estopped from raising the issue that the evidence should have been suppressed as counsel did not raise the issue in a motion to suppress; however, it reversed the conviction on an ineffective assistance claim. *State v. Watson*, 99-0243 (La.App. 4 Cir. 5/3/00), 763 So.2d 713. This Court reversed, again finding an ineffective assistance claim was better reserved for post-conviction. We explained that a motion to suppress is required so that a full evidentiary hearing can be held to address the issue and that a defendant is not allowed to first bring these claims up after the State has rested its case:

> In this case, the question of the constitutional validity of the seizure of [the evidence] was not at issue in the trial court. Thus, when the State tried this matter, its witnesses were not required to elaborate on why they stopped the defendant. Accordingly, neither the State nor the defendant had any need to scrutinize the detailed circumstances surrounding the seizure of [the evidence] and explore the evidence attendant to that police action. Therefore, the trial testimony of [the officer] focused only on the State's burden to establish beyond a reasonable doubt that the defendant possessed the heroin.

817 So.2d at 84.

That is similar to what happened in this case. Defendant never raised the claim to the trial court in a motion to suppress that the letter should have been suppressed because he asserted his right to counsel when approached by police on Sept. 10 or the police misled him to thinking he did not have a lawyer. Although the burden of proof was on the State on the trial of the motion to prove its admissibility, the defendant must raise all grounds for suppression of the evidence that

are knowable or available at that time. The defendant bears this burden in order to give the State adequate notice so that it may present evidence and address the issue at trial on the motion. Because Montejo did not raise these grounds in a motion to suppress or allege facts supporting those grounds, the State had no need to put on evidence tending to show that defendant never made a clear assertion of his right to counsel or that the police never misled him. It simply put on evidence at the motion hearing as required by La.C.Cr.P. art. 703(D) and La. R.S. 15:451 that the letter was admissible, and put on evidence at trial as required by La.C.Cr.P. art. 703(G) concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement. Thus, the officers only testified at the suppression hearing and at trial that basically they asked if he had a lawyer, he said no, and then they read him his rights. It was not until the defendant testified at trial that he told the police he thought he had a lawyer and they told him he did not, that this potential *Edwards* violation and waiver issue was ever even alluded to. The State had no need, and was not required, to rebut this testimony because the evidence had already been admitted and it had never been claimed that the letter was obtained illegally on those grounds. *See State v. Joseph*, 434 So.2d 1057, 1061, n. 3 (La.1983) (where defendant testified at trial that confession was beaten out of him and court had already ruled the statement was admissible in motion to suppress, because that ruling was binding at trial under La.C.Cr.P. art. 703, the state was not obligated to present rebuttal evidence to "rehabilitate" the confession).

As stated earlier, the Supreme Court recognized in remanding the matter that "Montejo's testimony came not at the suppression hearing, but rather only at trial, and we are unsure whether under state law that testimony came too late to affect the propriety of the admission of the evidence." The defendant argues under Louisiana law, in reviewing the trial court's ruling on a defendant's motion to suppress, this Court has stated that it will look to the totality of the evidence presented at the motion to suppress hearing and the trial. *State v. Burkhalter*, 428 So.2d 449, 455 (La.1983); *State v. West*, 408 So.2d 1302, 1308 (La.1982) ("Although the state put on no evidence at the hearing on the motion to suppress, we look to the totality of the evidence produced both at that hearing and at trial when we assess whether the state has carried its burden"). However, this jurisprudential rule will only be applied where the defendant has filed a motion to suppress alleging a statement was inadmissible on a specific constitutional ground and later a reviewing court looks to his trial testimony, in addition to the testimony presented at the motion hearing, to determine whether the motion to suppress should have been granted on those grounds. The jurisprudential rule is not applied where the grounds for suppression were not asserted in the motion to suppress. We have never allowed a defendant to allege facts for the first time in trial testimony which would support a new argument for suppression of evidence, and have a reviewing court consider those facts in determining whether the district court should have granted a motion to suppress on grounds that were never argued to, or considered

by, the district court. This is prohibited by La.C.Cr.P. arts. 703 and 841 and would allow rejection of the district court's determinations at the suppression hearing without any indication of abuse of discretion.

In this case, no motion to suppress was presented to the trial court. Thus, the trial court made no determination on the suppression issues presented in this assignment of error, and the trier of fact was not required to address the issues when determining Defendant's guilt. Conflicting testimony was presented at trial. Therefore, consideration of whether the claims asserted by Defendant would have warranted the granting of a motion to suppress would require this court to make credibility determinations. Moreover, counsel has not been given the opportunity to address or explain whether his failure to file a motion to suppress was trial strategy. *See State v. Bell*, 51,312 (La.App. 2 Cir. 5/17/17), 222 So.3d 79 (consideration of ineffective assistance of counsel arguments was pretermitted and could be raised via application for post-conviction relief where an evidentiary hearing giving counsel the opportunity to explain his trial strategy could be had). For these reasons, we find the issue of ineffective assistance of counsel should be relegated to post-conviction relief.

Defense counsel's failure to object to the evidence presented would not have compounded counsel's ineffective representation as La.Code Crim.P. art. 703(F) provides: "Failure to file a motion to suppress evidence in accordance with this Article prevents the defendant from objecting to its admissibility at the trial on the merits on a ground assertable by a motion to suppress."

*Excessive Sentence*

In his fourth assignment of error, Defendant contends the imposition of a $2,500.00 fine as part of his habitual offender sentence was excessive and an error patent. In its appellate brief, the State concedes imposition of the fine was improper.

In sentencing Defendant as a habitual offender, the trial court imposed a $2,500.00 fine, which we find was beyond the trial court's authority. In *State v. Dickerson*, 584 So.2d 1140, 1140 (La.1991) (per curiam), the supreme court held in pertinent part:

> [Louisiana Revised Statutes] 15:529.1 requires that the sentencing judge vacate the original sentence and resentence the defendant as a multiple offender. In resentencing, the judge must impose a sentence authorized by La.Rev.Stat. 15:529.1. That statute does not authorize the imposition of a fine, but only provides for enhanced sentences relating to the term of imprisonment. The trial judge was therefore without authority to impose a fine on resentencing under La.Rev.Stat. 15:529.1.
>
> Accordingly, the fine and default provisions of defendant's sentence are deleted.

*See also*, *State v. Edwards*, 09-799 (La.App. 3 Cir. 3/17/10) (unpublished opinion), *writ denied*, 10-849 (La. 11/19/10), 49 So.3d 396; *State v. Thomas*, 95-1646 (La.App. 3 Cir. 5/8/96), 680 So.2d 37. We amend Defendant's sentence to delete the fine and we instruct the trial court to make an entry in the court minutes to reflect the amendment.

## DECREE

For the above reasons, Defendant's conviction is affirmed, and his sentence is affirmed as amended. We further remand this matter to the trial court with instructions to amend the minutes of sentencing to reflect the deletion of the fine.

**CONVICTION AFFIRMED; SENTENCE AFFIRMED AS AMENDED; REMANDED WITH INSTRUCTIONS.**